2016 IL App (4th) 150543WC

NO. 4-15-0543WC

Opinion filed: April 29, 2016

FILED

April 29, 2016
Carla Bender
4th District Appellate
Court, IL

_____

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| STEVEN DUNTEMAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Macon County. |
| | ) | |
| v. | ) | No. 14 MR 1125 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | Honorable |
| COMPENSATION COMMISSION, *et al.* | ) | Robert C. Bollinger, |
| (Caterpillar, Inc., Appellee). | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    The claimant, Steven Dunteman, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)), seeking benefits for injuries he allegedly sustained on June 21, 2011, while working for the employer, Caterpillar, Inc.  The parties stipulated that on June 21, 2011, the claimant sustained an accidental injury arising out of and in the course of his employment.  After a

1

hearing, an arbitrator found that the claimant's current condition of ill-being was causally related to the accident and awarded him reasonable and necessary medical expenses, temporary total disability (TTD) benefits, and permanent partial disability (PPD) benefits.

¶ 2    A majority of the Illinois Workers' Compensation Commission (Commission) reversed the arbitrator's decision and vacated the awards of compensation, finding that the claimant suffered a work-related injury on July 21, 2011, but that his self-treatment of the work-related injury constituted an intervening accident that broke the chain of causation between his work-related blister and subsequent infection.  The dissenting Commissioner believed the claimant's infection was a foreseeable and natural consequence of the work-related blister and that his self-treatment was not an intervening accident that broke the chain of causation.

¶ 3    On judicial review, the circuit court of Macon County confirmed the Commission's decision.  The claimant filed a timely appeal.  For the reasons that follow, we reverse and remand for further proceedings.

¶ 4                              BACKGROUND

¶ 5    On October 19, 2011, the claimant filed an application for adjustment of claim pursuant to the Act, seeking benefits for injuries he allegedly sustained on June 21, 2011, while working for the employer.  The following factual recitation is taken from the evidence presented at the June 13, 2013, arbitration hearing.

¶ 6    During a 1999 Department of Transportation (DOT) physical examination, the claimant was found to have above normal blood sugar levels.  The DOT doctor encouraged him to improve his dietary habits but did not recommend any other treatment

2

or modifications. The claimant testified that he followed the doctor's advice and improved his eating habits. He stated that, between 1999 and 2008, he felt good, continued monitoring his diet, and had no issue with his blood sugar levels.

¶ 7 The claimant testified that he was first diagnosed with type II diabetes in October 2009 when he sought treatment for an unrelated work accident. When he saw his primary care doctor, Dr. Daniel Smith, on November 9, 2009, Dr. Smith noted that his blood sugar levels were elevated, that he was "trying to work on his diet," and that he continued "to be under a lot of stress." He began taking Metformin to reduce his blood sugar levels.

¶ 8 When the claimant saw Dr. Smith again on January 26, 2010, he had fluctuating blood sugar levels. Dr. Smith noted that the claimant continued monitoring his diet and that his diabetes was "under fair control."

¶ 9 The claimant testified that he continued taking Metformin and that he also began testing his blood sugar levels at home twice a day. He stated that he continued following-up with Dr. Smith and noticed that his blood sugar levels were dropping below normal. He testified that, after consulting with Dr. Smith, he stopped taking Metformin and regulated his blood sugar levels with a controlled diet between July 2010 and June 2011.

¶ 10 The parties stipulated that on June 21, 2011, the claimant sustained an accidental injury arising out of and in the course of his employment. At that time, he was working for the employer as an "outside driver." The automatic truck he usually drove was being repaired and in May 2011 was replaced with an older 10-speed truck, which required him to strike a manual clutch with his left foot about 200 times per shift. He struck the clutch forcefully with the bottom of his left foot because the clutch did not engage properly. He

3

wore steel-toed boots, but the bottom was rubber with no additional protection. He spent approximately 70% of the workday driving the truck and 30% of the day exiting the truck to perform tasks outside the truck. When exiting the truck, which he did about 30 times per day, he stepped onto a steel, ridged corrugated step and spun on the left upper portion of his foot, in the same area where his foot struck the clutch. On or about June 21, 2011, he noticed that the bottom pad of his left foot was sore. He continued performing his normal work duties, working 12-hour shifts for the next 9 or 10 days. He wore cotton socks with his work boots but continued having pain and problems with his left foot. Striking the clutch worsened the pain, and he began walking with a limp.

¶ 11   The claimant testified that on or about June 25, 2011, while bathing, he noticed a water blister under the callus on the bottom of his left foot between his third and fourth toes. He went to the kitchen, sterilized a needle by boiling it in hot water on the stove, propped up his foot, and inserted the needle to relieve the pressure of the water blister. He testified that pure "water" drained from the blister. He then used peroxide on a cotton swab to wipe the area. He indicated that he had performed this procedure, which his mother had taught him at a young age, many times in the past without complications. He stated that no physician had ever told him not to pop blisters on his foot in this manner.

¶ 12   On Dr. Smith's recommendation, the claimant resumed taking Metformin on June 28, 2011, to regulate his elevated blood sugar levels. According to the claimant, this was the first time he had been on medication in about one year because he had been able to regulate his diabetes with a controlled diet.

4

¶ 13    On July 1, 2011, the claimant called Dr. Smith to schedule an appointment.  Dr. Smith's records indicate that the claimant had a sore on his foot, which he was worried about getting infected, and that his foot was bruised under his callus.

¶ 14    The claimant testified that on July 4, 2011, his left foot was red and swollen around the blister.  Because he could not immediately get in to see Dr. Smith, he went to St. Mary's Hospital, where he saw Dr. Brooke Ballard.  He reported a 2-day history of fever with chills and a 4-day history of increasing left foot pain with swelling and redness.  He noted that 7 to 10 days earlier, he had driven a clutch transmission semi-truck at work and developed a callus on the bottom of his left foot over the fourth metatarsal region.  He found a blister and opened it himself.  Several days later, the top of his foot was turning red, with swelling and warmth.  He had been unable to work that day because of increased pain.  Dr. Ballard noted a past medical history of type II diabetes and a November 2009 hospitalization for cellulitis of his right lower extremity.  On examination, she found that he was swollen just below his left knee down to his toes.  He had a callus on the bottom of his left foot, redness and warmth on the top of his left foot affecting the second and third toes, and tenderness to palpation throughout.

¶ 15    That same day, the claimant saw Dr. Jason Anderson, a podiatrist at St. Mary's Hospital.  He reported that about a week and a half prior, he had noticed a blister on the bottom of his foot and had used a sterilized needle to drain the blister.  He indicated that he had not had a left leg infection like this in the past but that he did have a prior history of infection to his right leg after a blow to the leg by a large metal object.  His blood sugar level was 361, which indicated uncontrolled diabetes.  On examination, Dr.

5

Anderson found significant deep redness on the top of his left foot with lymphangitis and lymphadenopathy in both the inguinal and popliteal glands. There was a thick callus sub third metatarsal head extending distal lateral to the fourth digit on the bottom of his left foot. Dr. Anderson debrided in the area of the third metatarsal head and found a full thickness ulceration that was malodorous and measured two centimeters in diameter with a necrotic fibrotic base. The claimant was diagnosed with severe cellulitis left extremity with low grade temperature, lymphadenopathy, and diabetes with loss of protective sensation. He was admitted to the hospital and put on broad spectrum antibiotics.

¶ 16    On July 5, 2011, the claimant underwent his first surgery performed by Dr. Anderson, an incision and drainage of the deep abscess of his left foot third interspace with debridement of the tendon and fascia and delayed closure. According to the operative report, attention was focused on the bottom of his foot where the ulceration was noted. Dr. Anderson performed incisions "encompassing" the ulceration, which was directly beneath the third metatarsal head.

¶ 17    On July 6, 2011, the claimant underwent a second surgery performed by Dr. Anderson, a secondary irrigation and debridement with delayed closure. His diagnosis was "deep abscess left foot," and his third toe had venous congestion. His cellulitis improved, and he was discharged from the hospital on July 8, 2011, with instructions to take oral antibiotics, follow a diabetic diet, and regularly test his blood sugar levels.

¶ 18    The claimant saw Dr. Anderson again on August 2, 2011. The doctor noted that the distal aspect of his third toe was completely "gangrenous" and "necrotic." On August 5, 2011, the claimant underwent a third surgery performed by Dr. Anderson, a left third

6

toe amputation with medial based toe flap closure and deep interspace debridement in the left third interspace. His diagnoses were left third toe necrosis and cellulitis.

¶ 19 Dr. Anderson took the claimant off work on July 4, 2011, and released him to return to work effective September 5, 2011. At that time, he returned to full duty work with no restrictions.

¶ 20 When the claimant saw Dr. Anderson again on September 20, 2011, the redness and swelling had resolved, and no new lesions or open ulcerations were present. Dr. Anderson noted that the claimant's job put him at risk for these ulcerations because he had to use his left foot not only to clutch but also to get in and out of the truck. The doctor opined that "[t]his is most likely the cause of his original ulceration" and that "there would have been no reason for him to suffer a large callus without the direct mechanism and repetitive mechanism."

¶ 21 On February 7, 2012, at his attorney's request, the claimant underwent an independent medical examination by Dr. Jeffrey Coe, a board certified occupational medicine specialist. Dr. Coe testified by evidence deposition that he considered the history the claimant gave him, the treatment records from St. Mary's Hospital and Dr. Anderson, and his own clinical examination of the claimant. Dr. Coe testified, to a reasonable degree of medical certainty, that there was a causal relationship between the nature of the claimant's work with the employer involving the repetitive clutch depression and exiting of the truck and his current condition of ill-being of his left foot. Dr. Coe described the claimant's diabetes as mild because he was not insulin-dependent, controlled his blood sugar levels with diet only, and had no known complications

7

associated with diabetes. Dr. Coe testified that the claimant had a higher risk of infection as a result of his diabetes but opined that he would not have developed the infection if he had not developed a blister from his work activities. Dr. Coe opined that "the infection arose from the penetration of the blister in his left foot with a needle."

¶ 22 Dr. Coe stated that the claimant's prognosis was excellent. The wound was healed, and he had returned to full activities, but he did have changes in sensation and balance as well as a flexion contracture, or hammer toe deformity, in his left second toe.

¶ 23 On May 25, 2012, at the employer's request, the claimant underwent an independent medical examination by Dr. Ernest Chiodo, who is board certified in internal medicine, occupational and environmental medicine, and public health and epidemiologic medicine. Dr. Chiodo, who testified by evidence deposition, found no causal relationship between the surgeries and the claimant's work duties and asserted that the claimant's infection "happened on the top of his foot, not on the bottom." Although Dr. Chiodo acknowledged that the claimant's repetitive use of the clutch caused the blister and that once a blister has formed, complications can arise from it, he believed that neither the blister nor the lancing of the blister contributed to the claimant's foot infection.

¶ 24 Dr. Chiodo testified that the claimant had uncontrolled diabetes and was not exercising diabetic foot care. He testified that the claimant had roughened and chapped feet with slight cracking of the top of his left foot. On examination, Dr. Chiodo found brownish discoloration consistent with atrophic changes involving the left foot consistent with poor blood supply in addition to the lack of any diabetic foot care. Based on the medical records and history of poor foot care, Dr. Chiodo opined that the infection

8

occurred on the top of the foot originally due to uncontrolled diabetes and lack of proper diabetic foot care and that there was no causal connection between the infection and the blister on the bottom of his foot. Dr. Chiodo stated that "there is the very plausible alternative explanation of bacterial intrusion through cracked, roughened skin in an area on the top of his foot remote from the blister." Although Dr. Chiodo believed the cellulitis was causally connected with the amputation of the toe, he did not believe the cellulitis was work related.

¶ 25   The claimant testified that he listened to and followed Dr. Smith's orders when it came to the treatment of his diabetes. He stated that he had not taken Metformin since September 2012 because he had lost weight and was able to control his diet. He testified that he would resume taking Metformin if Dr. Smith recommended it but that no doctor had recommended that he resume taking medication to control his blood sugar.

¶ 26   The claimant returned to work with the employer on September 5, 2011, keeping the same job title. He testified that he was currently working a 40-hour work week, with no restrictions or assistance. His current job duties were similar to his duties before the work accident, but he was now driving an automatic "jockey truck." He was in a different department, which required transporting frames, which was lighter duty work than his prior position. He did not have to move as much in his current position.

¶ 27   The claimant testified that, after his foot surgeries, it was harder to get up after being on his knees because he could not put as much pressure on the amputation site due to the immense pain it caused. He had to adjust the manner in which he got up from this position. He testified regarding issues concerning his balance, in that he wobbled if he

did not put pressure on his left foot, but the pressure caused pain. He stated that cold temperatures caused discomfort in his foot and that the scarred area became numb.

¶ 28 The claimant offered into evidence invoices for medical expenses he had incurred as a result of the foot treatment, noting an outstanding balance of $2,117.13. The remaining medical bills had been paid through the employer's group insurance carrier.

¶ 29 On August 8, 2013, the arbitrator filed a decision, finding that on June 21, 2011, the claimant sustained an accidental injury arising out of and in the course of his employment and that his current condition of ill-being was causally related to the accident. More specifically, the arbitrator found that the claimant suffered from a work-related blister, which he self-treated in a sterile manner, and subsequently developed an infection resulting in multiple surgeries and the amputation of his third, middle toe.

¶ 30 The arbitrator found that the claimant did not commit an injurious practice under section 19(d) of the Act (820 ILCS 305/19(d) (West 2010)). The arbitrator noted that the claimant was informed of an elevated blood sugar level in 1999 and took reasonable measures to treat the condition, which included dietary changes, lifestyle modifications, and a reduction of his daily stresses. In 2009, he was diagnosed with type II diabetes; it was recommended that he begin treatment for that condition; and he immediately did so with Dr. Smith. The arbitrator found that there was nothing in Dr. Smith's medical records to indicate a failure to comply, treat, or otherwise follow the appropriate protocol. To the contrary, the claimant began taking medication, had regular follow-up visits, monitored his blood sugar levels daily, and continued monitoring his diet. It was only after his blood sugar levels dropped that he stopped taking the medication. His blood

sugar levels spiked again after the left foot injury, and he again followed-up with Dr. Smith. The arbitrator found that, contrary to Dr. Chiodo's opinion, the record shows that the claimant followed-up with medical supervision and medications and monitored his diet, weight, and blood sugar levels once he was diagnosed with diabetes. The arbitrator found that there was no indication of non-compliance or any failure to appropriately treat his diabetes. The arbitrator, thus, found that the claimant's conduct in this regard did not rise to the level of an injurious practice under section 19(d).

¶ 31    The arbitrator also found that the claimant's lancing of his blister did not rise to the level of an injurious practice. The arbitrator noted that the un-rebutted testimony shows that the claimant popped his blister using a home remedy technique in a sanitary fashion. The arbitrator found that it was not unreasonable for a person to "pop" what appears to be a "water blister" with a sanitary needle. The arbitrator noted that, although the claimant did suffer from diabetes, the un-rebutted testimony shows that neither his treating physician, nor any other doctor, ever told him not to "pop" his blisters in this way.

¶ 32    The arbitrator awarded the claimant TTD benefits of $475.87 per week for 9 weeks from July 4 through September 4, 2011; PPD benefits of $428.29 per week for 46.4 weeks because the injuries sustained caused the 100% loss of use of the third toe and the 20% loss of use of the left foot; and $2,117.13 in medical expenses.

¶ 33    The employer sought review of the arbitrator's decision before the Commission. On December 10, 2014, a majority of the Commission reversed the arbitrator's decision and vacated the awards of compensation, reasoning as follows:

11

"[T]he parties stipulated that [the claimant's] work activities caused the development of the blister. However, *** the infection did not come from the existence of the blister, but from [the claimant's] lancing of the blister, which constitutes an intervening accident that breaks the causal chain between the development of the blister and [his] current condition of ill-being. The blister, in and of itself, did not lead to the infection. [The claimant's] actions lead [*sic*] to the infection, and the infection is what led to the amputation of [his] left third toe.

There is nothing in the record to indicate that the infection was a result of [the claimant's] work with [the employer]. Instead, as explained above, the record points to [the claimant's] lancing of the blister, and not the blister itself, as the cause of [his] left foot infection. Therefore, *** the Commission finds that the infection, and not the blister, caused [his] left foot condition and, ultimately, the amputation of [his] left third toe. As a result, [he] failed to prove that the development of the blister at work is causally related to [his] need for treatment of an infection, the amputation of his toe, and his current condition of ill-being. Therefore, the Commission reverses the Arbitrator's finding regarding causal connection and finds that [the claimant's] current condition of ill-being is not causally related to the June 21, 2011 accident."

¶ 34    In response to the employer's argument that the claimant engaged in injurious practices under section 19(d) of the Act by lancing the blister, the Commission stated:

"[Section 19(d)] deals with a claimant negatively affecting his/her recovery. It does not deal with a claimant's actions as the cause of his/her injuries or a

12

claimant's behavior severing the causal connection between a work accident and the claimant's condition of ill-being. Therefore, Section 19(d) *** does not apply to the case at bar."

¶ 35 The dissenting Commissioner would have upheld the arbitrator's decision. In his view, the claimant's "lancing the blister in a sterile manner does not constitute an intervening accident" but was, instead, "a natural consequence of the work-related injury." According to the dissent, if the claimant had not incurred the work-related blister, his foot would not have become infected, and no amputation would have been required. The dissent noted that applicable case authority requires that the intervening accident must completely break the causal chain between the injury and ensuing condition and that the accidental injury need only be a causative factor in the resulting condition of ill-being. The dissent concluded that the stipulated work-related accident led to a blister, which was a causative factor in the claimant's resulting infection, and that it is foreseeable that a blister will become infected.

¶ 36 The claimant filed a timely petition for judicial review in the circuit court, which confirmed the Commission's decision on June 15, 2015. This appeal followed.

¶ 37                                    ANALYSIS

¶ 38 Prior to reaching the merits of this appeal, we must first determine the appropriate standard of review. The employer argues that causation is a question of fact and that the appropriate standard of review is, therefore, whether the Commission's finding was against the manifest weight of the evidence. The claimant asserts, however, that he does not dispute any of the Commission's factual findings, including its finding that his

13

lancing of his work-related blister with a sterilized needle caused his infection. He argues that, because the facts determined and relied upon by the Commission are undisputed on appeal, the Commission's finding with regard to causation presents a question of law subject to *de novo* review. We agree with the employer.

¶ 39 Causation, including the existence of an independent intervening cause, is a question of fact for the Commission, and its finding in that regard will not be reversed on appeal unless it is against the manifest weight of the evidence. *Global Products v. Workers' Compensation Comm'n*, 392 Ill. App. 3d 408, 411, 911 N.E.2d 1042, 1046 (2009).

¶ 40 To obtain compensation under the Act, a claimant must show, by a preponderance of the evidence, that he suffered a disabling injury that arose out of and in the course of his employment. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 671 (2003). The "in the course of" component refers to the time, place, and circumstances under which the injury occurred. *Id.* The "arising out of" component addresses the causal connection between a work-related injury and the claimant's current condition of ill-being. *Id.* at 203, 797 N.E.2d at 672. An injury "arises out of" one's employment if it "had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Id.*

¶ 41 Here, the parties stipulated that on June 21, 2011, the claimant sustained an accidental injury that arose out of and in the course of his employment. However, the employer argues that the work-related blister was not causally related to the subsequent

14

infection. The Commission agreed, finding that the claimant's lancing of the blister, and not the blister itself, caused his infection and that this was an independent intervening accident that broke the chain of causation between the blister and subsequent infection.

¶ 42    "Every natural consequence that flows from an injury that arose out of and in the course of one's employment is compensable under the Act absent the occurrence of an independent intervening accident that breaks the chain of causation between the work-related injury and an ensuing disability or injury." *National Freight Industries v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120043WC, ¶ 26, 993 N.E.2d 473. "Under an independent intervening cause analysis, compensability for an ultimate injury or disability is based upon a finding that the employee's condition was caused by an event that would not have occurred 'but for' the original injury." *Id.*

¶ 43    "For an employer to be relieved of liability by virtue of an intervening cause, the intervening cause must completely break the causal chain between the original work-related injury and the ensuing condition." *Global Products*, 392 Ill. App. 3d at 411, 911 N.E.2d at 1046. A work-related injury "need not be the sole causative factor, nor even the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being." (Emphasis in original). *Sisbro*, 207 Ill. 2d at 205, 797 N.E.2d at 673.

¶ 44    As long as there is a "but-for" relationship between the work-related injury and subsequent condition of ill-being, the employer remains liable. *Global Products*, 392 Ill. App. 3d at 412, 911 N.E.2d at 1046. See also *International Harvester Co. v. Industrial Comm'n*, 46 Ill. 2d 238, 239-41, 247, 263 N.E.2d 49, 50-51, 55 (1970) (claimant's continuing traumatic neurosis resulting from a work-related head injury was a causative

15

factor in the total and permanent disability that occurred four years later when his wife struck him in the head); *Harper v. Industrial Comm'n*, 24 Ill. 2d 103, 109, 180 N.E.2d 480, 483 (1962) (" 'While (the act of suicide) may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an act intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a cause intervening between the injury and the death.' "); *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 788-89, 821 N.E.2d 807, 814 (2005) (three automobile accidents did not break the causal connection between claimant's work-related back injury and current condition of ill-being because even if the initial automobile accident was responsible for the failed fusion, "such a condition could not have developed but for the surgery, which everyone agreed was necessary as a result of claimant's work injury"); *Mendota Township High School v. Industrial Comm'n*, 243 Ill. App. 3d 834, 835-38, 612 N.E.2d 77, 77-79 (1993) (claimant's racquetball injury and sneezing episode were only contributing causes of disc rupture, and not intervening causes, where "[h]ad it not been for the original [work-related] injury, in all probability claimant's back problems would not have reached the stage they did in such a short period of time"); *Fermi National Accelerator Lab v. Industrial Comm'n*, 224 Ill. App. 3d 899, 908, 586 N.E.2d 750, 756 (1992) (claimant's second fall involving use of crutches was not an intervening accident that broke the causal connection between his work-related fall and current condition of ill-being where he would not have been using crutches but for the work-related injury).

16

¶ 45 A review of the record in this case demonstrates that there is clearly a "but-for" relationship between the claimant's work-related blister and subsequent infection. Quite simply, even if the claimant's lancing of the work-related blister with a sterilized needle was the immediate cause of his infection, as the Commission found, the infection would not have occurred "but for" the existence of the work-related blister. That is because "but for" the existence of the work-related blister, there would have been no blister to lance. His employment, therefore, remains *a* cause of his current condition of ill-being. The Commission's finding that the claimant's self-treatment was an independent intervening accident that broke the chain of causation between his work-related blister and subsequent infection was, therefore, against the manifest weight of the evidence.

¶ 46                    CONCLUSION

¶ 47 For the foregoing reasons, we reverse the judgment of the circuit court of Macon County, reverse the decision of the Commission, and remand to the Commission for further proceedings consistent with this decision.

¶ 48 Circuit court's judgment reversed; Commission's decision reversed; cause remanded.