# Illinois Official Reports

## Appellate Court

*Par Electric v. Illinois Workers' Compensation Comm'n,*
2018 IL App (3d) 170656WC

| | |
|---|---|
| Appellate Court Caption | PAR ELECTRIC, Plaintiff-Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Dallas Hamm, Appellee). |
| District & No. | Third District, Workers' Compensation Commission Division Docket No. 3-17-0656WC |
| Filed | October 19, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, Nos. 16-MR-821, 17-MR-246; the Hon. James A. Mack, Judge, presiding. |
| Judgment | Affirmed and remanded. |
| Counsel on Appeal | Glenn A. Blackmon, Jigar S. Desai, and Jonathan M. Zarate, of Rusin & Maciorowski, Ltd., of Chicago, for appellant. |
| | Stephen P. Kelly and Jennifer Bonesteel, of Stephen P. Kelly, Attorney at Law, L.L.C., of Peoria, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment and opinion. |

**OPINION**

¶ 1      On October 31, 2014, claimant, Dallas Hamm, filed an application for adjustment of claim (case No. 14 WC 37190) pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2014)) seeking benefits for an injury to his right arm on June 16, 2014, while in the employ of respondent, Par Electric. Claimant subsequently filed two additional applications for adjustment of claim (case Nos. 15 WC 19322 and 15 WC 19323), alleging injuries to his right shoulder on April 1, 2015, and April 3, 2015, while working for Henkels & McCoy (Henkels). Following a consolidated hearing held pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2014)), the arbitrator found that claimant sustained three accidents and that his condition of ill-being was causally related to all three accidents. In case No. 14 WC 37190, the arbitrator awarded claimant $23^{6}/_{7}$ weeks of temporary total disability (TTD) benefits, covering the period from September 26, 2014, through March 11, 2015. The arbitrator also concluded that respondent was liable for claimant's medical expenses, but only those incurred prior to March 11, 2015. In case Nos. 15 WC 19322 and 15 WC 19323, the arbitrator awarded claimant $37^{2}/_{7}$ weeks of TTD benefits, covering the period from April 6, 2015, through the date of the arbitration hearing, and ordered Henkels to pay medical expenses incurred after April 1, 2015, as well as prospective medical treatment.

¶ 2      Thereafter, Henkels and respondent sought review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). In case No. 14 WC 37190, the Commission modified the arbitrator's decision in part, but otherwise affirmed and adopted the decision of the arbitrator. Specifically, the Commission affirmed the arbitrator's finding that claimant sustained three distinct accidents on June 16, 2014, April 1, 2015, and April 3, 2015, but determined that the two accidents sustained in April 2015 did not constitute independent intervening accidents sufficient to break the causal connection from the initial accident. Accordingly, the Commission concluded that claimant's current condition of ill-being was causally related to the June 2014 accident and that respondent was liable for all medical expenses and benefits resulting from claimant's injuries. In addition, the Commission remanded the cause to the arbitrator for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980). In case Nos. 15 WC 19322 and 15 WC 19323, the Commission reversed the decision of the arbitrator, finding that claimant failed to sustain his burden of proving a causal connection between the April 2015 accidents and his current condition of ill-being.

¶ 3      Both respondent and claimant sought judicial review of the Commission's decisions. Following a hearing, the circuit court of Peoria County confirmed the decisions of the Commission. Respondent now appeals, challenging the Commission's finding that the April 2015 accidents did not constitute intervening accidents sufficient to break the causal connection from the June 2014 accident. We affirm.

¶ 4                             I. BACKGROUND

¶ 5      The following factual recitation is taken from the evidence presented at the arbitration hearing conducted on December 22, 2015.

¶ 6                                      A. June 2014 Accident

¶ 7         Claimant testified he worked as an apprentice lineman through the International Brotherhood of Electrical Workers. Claimant's job duties in this position involved extensive physical work, including restoring power, building new lines, climbing poles, and digging holes. On June 16, 2014, claimant was assigned to work for respondent building new lines. On that date, as claimant was getting out of a bucket lift, he slipped. Claimant attempted to catch himself by grabbing something when he felt his right shoulder come out of the socket, resulting in a lot of pain. Claimant and a coworker reported the accident to respondent, and claimant was taken to the emergency room at OSF St. Francis Medical Center (OSF). Claimant testified that prior to June 16, 2014, he had not experienced any problems with his right shoulder while working for respondent.

¶ 8         In the emergency room, claimant provided a consistent history of the accident to the staff at OSF. An X-ray taken at the hospital was normal. Dr. Edward Moody treated claimant and diagnosed a right rotator cuff strain. Claimant was placed on modified duty and eventually underwent a course of physical therapy. Nevertheless, claimant continued to experience pain with overhead activity and certain shoulder motions. As a result, Dr. Moody ordered an MRI of the right shoulder. The MRI, taken on August 5, 2014, suggested a diffuse labral tear but no rotator cuff tear. Dr. Moody referred claimant to Dr. Lawrence Li, an orthopaedic surgeon, for further treatment.

¶ 9         Claimant first presented to Dr. Li on August 14, 2014. After examining claimant and reviewing the MRI, Dr. Li diagnosed a right shoulder labral tear due to dislocation. He recommended surgical repair. Meanwhile, claimant remained on light duty until September 26, 2014, at which time Dr. Li performed a right shoulder arthroscopy with debridement of extensive tenosynovitis and repair of a capsulolabral Bankart-type separation. Postoperative treatment included a cortisone injection and an extensive course of physical therapy. By mid-January 2015, claimant reported to the physical therapist that the pain in his right shoulder was at level two on a ten-point scale.

¶ 10        On January 21, 2015, claimant underwent a functional capacity evaluation (FCE), which was considered valid with claimant providing maximum effort. Claimant reported discomfort in the anterior right shoulder during certain exercises, but the pain decreased once the activity ceased. Identified physical limitations included right shoulder pain, right shoulder strength deficits, bilateral hip range of motion deficits, and general deconditioning stemming from being off work since the date of injury. The therapist concluded that claimant was able to operate consistently at the medium physical-demand level with rare work in the heavy physical-demand level. He noted, however, that claimant's physical abilities did not match the requirements of his job and that claimant's physical limitations presented a barrier to returning to work unless modifications could be made. The therapist recommended a work-conditioning program, which claimant began on January 26, 2015.

¶ 11        On February 26, 2015, claimant was evaluated by Dr. George Paletta. At that time, claimant was still experiencing mild discomfort to the anterior aspect of the shoulder, but reported making significant improvement in work conditioning. Dr. Paletta documented that claimant had a previous shoulder problem when he was in eighth grade, but once claimant underwent surgery and the injury healed, he had not had any problems with it. Upon physical examination, Dr. Paletta noted that claimant demonstrated minimal motion losses, excellent strength and function, and good stability. Dr. Paletta's impression was "[d]oing well status

post arthroscopy with anterior stabilization and Bankart repair." He recommended an additional two weeks of work conditioning, followed by a return to full-duty work without restriction or limitation. Dr. Paletta opined that claimant's right shoulder condition was causally related to the June 2014 work accident.

¶ 12    Claimant was discharged from work conditioning on March 10, 2015. At that time, the therapist recorded that claimant had progressed rapidly during the final three weeks of work conditioning, had met all of his goals, and was prepared to return to work full duty. On March 11, 2015, Dr. Li released claimant to full duty without restrictions and instructed him to follow up in four weeks. Claimant testified that although his shoulder had progressed, it was still weak and painful. Nevertheless, claimant returned to work because he was released to do so and he thought that his condition would improve with work.

¶ 13                              B. April 2015 Accidents

¶ 14    Claimant was hired by Henkels on or about March 23, 2015. Claimant worked for Henkels as an apprentice lineman—the same position he had with respondent. On April 1, 2015, claimant was still experiencing pain and weakness in his right shoulder. On that date, claimant threw a large roll of electric tape to a coworker in a bucket lift. Claimant testified that he felt his shoulder "roll and come out of [the] socket," causing a lot of pain. Claimant ignored the pain because he did not want to think he reinjured his shoulder. He finished his work shift, but "babied" his shoulder the rest of the day.

¶ 15    Claimant returned to work the next day, although his shoulder was sore. On April 3, 2015, a Friday, claimant threw a wire grip to a coworker in a bucket lift. Claimant estimated that he tossed the wire grip 15 to 20 feet. Claimant testified that this activity is common in his job. According to claimant, when he threw the wire grip his shoulder "did the exact same thing as it had done" on April 1. That is, claimant felt his shoulder "roll" and "come out of the socket" and he experienced pain. Claimant finished the workday but had to "baby" his right shoulder. Claimant testified that the pain he experienced following these two incidents was more severe than it was when he went to work for Henkels.

¶ 16    Claimant returned to Dr. Li on April 6, 2015, for a prescheduled appointment. At that time, claimant related the two incidents that occurred while he was working for Henkels. Dr. Li ordered an MRI-arthrogram and placed claimant on light duty. However, there was not much light-duty work available in his field, so Henkels could not accommodate his restrictions. Claimant underwent the MRI-arthrogram on April 16, 2015. On April 22, 2015, Dr. Li noted the film showed a "[d]iffuse labral tear," "[n]o rotator cuff tear," "[o]ld posttraumatic and postsurgical changes of the glenoid rim," and a SLAP tear. ("SLAP" is a superior labral tear from anterior to posterior.) Dr. Li recommended surgery involving a repair of the SLAP tear "to prevent the subluxation that occurred after [claimant] returned to work." During an April 28, 2015, follow-up visit, claimant asked Dr. Li about the cause of his right shoulder condition. Dr. Li told claimant that his right shoulder condition was "a result of his original injury from June 2014 and subsequent surgery." He also issued a note stating claimant's right shoulder injury "is related to the 6/16/14 injury."

¶ 17    Meanwhile, on May 4, 2015, claimant saw Dr. Paletta for an independent medical examination. Dr. Paletta noted that following claimant's June 2014 work accident, Dr. Li released claimant to full duty on March 11, 2015. Within the first week of returning to work, claimant was involved in two throwing incidents that resulted in problems involving his right

shoulder. After examining claimant and reviewing the MRI-arthrogram, Dr. Paletta diagnosed a labral tear with biceps anchor or SLAP lesion involvement. Dr. Paletta opined that the previous area of repair was "likely intact" and that the recent injury appeared to be "an extended labral tear that involves a new area of the labrum not previously involved with the initial tear." Dr. Paletta found that the mechanism of injury described by claimant "would be appropriate for propagating or creating an extended labral tear." He agreed with Dr. Li's recommendation for a revision labral repair, but also recommended a biceps tenodesis. Dr. Paletta opined that claimant had reached maximum medical improvement (MMI) following the June 2014 injury and returned to full duty and that the need for the revision surgery was "related to the more recent injury and not as a result of the initial tear from 6-16-14 which clearly involved a different part of the labrum."

¶ 18        Claimant underwent a second surgery on July 8, 2015. The surgery, performed by Dr. Li, consisted of a right shoulder arthroscopy with debridement and chondroplasty of the humeral head, arthroscopic repair of the anterior and anterior inferior labrum, repair of a SLAP tear, a biceps tenodesis, and the removal of a loose anchor. Following surgery, claimant underwent conservative treatment and physical therapy. Claimant testified that he was placed on light duty from April 6, 2015, through the date of surgery, but no employer had offered him work within his restrictions. As of the date of the arbitration hearing, claimant was still under the care of Dr. Li. Claimant testified that he continued to experience pain in his right shoulder and his strength was "not great." He noted that he recently began strength building in physical therapy.

¶ 19                              C. Evidence Deposition of Dr. Li

¶ 20        Dr. Li—a board-certified orthopaedic surgeon specializing in shoulders, hands, and knees—testified by evidence deposition on July 27, 2015. Dr. Li testified that the trauma claimant sustained as a result of the work accident in June 2014 caused inflammation of the tenosynovium tissue; damage to the glenohumeral joint of the shoulder, which is commonly referred to as the ball and socket joint; and a complete tear of the capsulolabral complex "from about two to six o'clock." Dr. Li testified that these findings are consistent with someone who fell with an outstretched arm and whose shoulder was dislocated and relocated. Dr. Li testified that someone with this type of pathology is at "significant risk" for future dislocations. As a result, Dr. Li recommended surgery. To this end, on September 24, 2014, Dr. Li performed a right shoulder arthroscopy with debridement of tenosynovitis and repair of a capsulolabral Bankart-type separation. Dr. Li noted that one facet of the surgery involved anchoring sutures into the bone.

¶ 21        Dr. Li released claimant to return to work full duty without restrictions on March 11, 2015, after claimant had undergone physical therapy and work conditioning. Claimant presented to Dr. Li on April 6, 2015, following the two incidents that occurred while working for Henkels. Dr. Li ordered an MRI and later performed a second operation on July 8, 2015. The second operation consisted of an arthroscopy with debridement and chondroplasty of the humeral head, arthroscopic repair of the anterior and anterior inferior labrum, repair of SLAP tear, a biceps tenodesis, and the removal of a loose anchor. Dr. Li recounted that a SLAP tear is a labral tear, but in the superior quadrant "between eleven and one o'clock."

¶ 22        Dr. Li was asked whether claimant's need for the second surgery and treatment resulted from the June 2014 accident or whether the accidents in April 2015 constituted intervening

accidents which broke the chain of causal connection. Dr. Li testified that claimant's condition was partly attributable to *sequelae* of the June 2014 injury, adding that there was some worsening of claimant's condition from the subsequent dislocation. Dr. Li further responded:

> "I think the original surgery had not fully healed. The construct which he had for his shoulder at the time that he was throwing the tape and throwing the grip was weaker than he was—than it was before his first accident, and those actions caused the capsule to—well, the shoulder to dislocate and the capsule to pull away and the anchor to pull out.

> So because in my second surgery I was able to see the anchor pulled out I would have to relate it to that this would be a consequence of the treatment from his first injury, so therefore I relate it to his first injury."

Dr. Li further opined that because the subsequent labral tear was adjacent to the tear claimant sustained as a result of the June 2014 accident, the subsequent tear was an extension of the previous tear "up to the region of the SLAP tear" and was related to the first accident. Dr. Li also cited the proximity in time between claimant's first accident, his release to work, and his subsequent accidents as a factor in finding causation "because it's certainly within the time frame of incomplete healing."

¶ 23    On cross-examination by respondent's attorney, Dr. Li acknowledged that the extended tear was not the result of the June 2014 accident, but rather the April 2015 accidents. Dr. Li agreed that if claimant did not perform the throwing actions in April 2015, it is unlikely he would have re-dislocated his shoulder. Dr. Li also agreed that claimant did not have a SLAP tear as a result of the first accident and that the tear from the first injury did not extend as high as what would be required to perform a biceps tenodesis. Dr. Li was unaware of claimant having a history of dislocations prior to the 2014 accident.

¶ 24    On cross-examination by the lawyer for Henkels, Dr. Li testified that if claimant had had a dislocation 15 years earlier, that fact would have no impact on his causation opinion regarding claimant's current condition. Dr. Li testified that the January 2015 FCE determined that claimant was capable of medium-duty work. As this was not sufficient for claimant to return to his regular job duties, work conditioning was ordered. Upon claimant's release from work conditioning, he had some limited scapular abduction and decreased internal and external rotation. Dr. Li testified that a loss of range of motion would be expected as a result of the surgery claimant underwent, and he was not concerned about it as long as claimant was able to meet his job duties. Dr. Li testified that when he released claimant in March 2015, he asked claimant to follow up with him in four weeks. Dr. Li wanted to see claimant again because, he explained, no matter how good work conditioning is, it is not the real job. Dr. Li added that claimant was not released from his care in March 2015 when he released him to work full duty. Dr. Li further explained that "there were some findings in the second surgery that weren't present in the first surgery, but there was still the finding—the crux of this is the finding where the shoulder re-dislocated, pulled out the anchor that was inserted to repair the labrum that was put in as a result of the original injury." Therefore, Dr. Li opined that claimant's injuries following the April 2015 accidents were related to the initial injury and resulting treatment.

¶ 25    On redirect examination, Dr. Li was asked whether—based upon claimant not healing completely from the first surgery, the extension of the labral tear, the extension being adjacent to the previous tear, and the anchor coming loose from the site of the previous surgery—it was more likely than not that claimant's second surgery was "a continuation" of the first surgery.

Dr. Li responded "[f]or sure because the anchor was found to be loose it is a continuation of the first surgery."

¶ 26    On recross-examination by respondent's attorney, Dr. Li testified that the extension of the tear being related to the first injury is based in large part on the fact that the injuries in April 2015 loosened the anchor he installed during the first operation. Dr. Li further testified that the second surgery most likely would not have happened if the first injury had not happened.

¶ 27                          D. Dr. Paletta's October 1, 2015, Deposition

¶ 28    Dr. Paletta testified by evidence deposition on October 1, 2015, that he is a fellow trained in sports medicine and that 60% of his practice involves shoulder work, with the remainder evenly divided between elbow and knee work. Dr. Paletta first evaluated claimant on February 16, 2015, and prepared a report of his findings. At that time, Dr. Paletta took a history from claimant, which included an incident when claimant was in eighth grade and that resulted in a fracture and dislocation of his right shoulder that necessitated surgical treatment. Claimant stated that once the injury healed, he "basically" returned to normal function with the right shoulder. Claimant told Dr. Paletta that he injured his right shoulder at work in June 2014 when he "fell in the bed of a truck and reached out with his right arm to try and prevent the fall." On the date of the examination, claimant reported that he was doing well after undergoing an operation on his right shoulder. Although claimant complained of some mild discomfort in the front of the shoulder, he indicated that he was making continued improvement with physical therapy and was participating in a work-conditioning program. Dr. Paletta thought claimant was doing well following surgery and was "nearly complete in his recovery." Dr. Paletta recommended that claimant complete the course of work conditioning, after which he could return to full duty. Dr. Paletta testified that claimant's condition, as of the date of the February 2015 evaluation, was causally related to claimant's June 2014 work accident.

¶ 29    Dr. Paletta saw claimant again on May 4, 2015. At that time, claimant reported that he had completed work conditioning and returned to full duty work when he was involved in two incidents that he associated with a recurrence of shoulder pain. During the first incident, claimant felt his shoulder slip out of place as he threw a roll of electrical tape to a coworker. Claimant was able to manipulate the arm so as to pop the shoulder back into place. The second incident occurred a couple of days later. Claimant described throwing a wire grip, weighing a couple of pounds, to a coworker in a bucket lift about 12 feet away. Claimant again experienced the sensation of his shoulder slipping out of position, requiring claimant to manipulate his arm to get it back into place.

¶ 30    At the time of claimant's visit in May 2015, claimant's principal complaint was of pain in the right shoulder. Claimant stated that the pain was identical to the pain he experienced prior to his most recent surgery. Dr. Paletta noted that the MRI-arthrogram showed the repaired labral tear was still intact, although claimant appeared to have "a new labral tear that extended beyond the area that had been previously repaired." Dr. Paletta's diagnosis was an extended superior labral tear, or SLAP lesion, following previous repair of the anterior/inferior labrum. Dr. Paletta opined that the pathology shown on the MRI-arthrogram was a new tear. Insofar as claimant's injury involved a new area of the labrum, it was Dr. Paletta's opinion that the injury was not a consequence of his old injury, but rather represented "a new problem." Dr. Paletta agreed with Dr. Li's recommendation for a repeat labral repair, although he noted that the

repair would involve a different part of the labrum. Dr. Paletta also recommended a biceps tenodesis.

¶ 31 Dr. Paletta testified that whether Dr. Li placed claimant at MMI after the first surgical procedure made no difference in reaching his opinion about claimant's current condition. Dr. Paletta explained that at the time of his evaluation in February 2015, claimant had no signs or symptoms of a SLAP tear and the operative photographs from his initial surgery showed no evidence of a SLAP tear. After the throwing incidents, however, the MRI-arthrogram clearly showed evidence of a SLAP tear without any disruption of his previous labral tear. Dr. Paletta concluded that one or both of the throwing incidents "caused or contributed" to the development of the SLAP tear, "which was a different condition in his shoulder than what Dr. Li had previously treated [claimant] for."

¶ 32 Dr. Paletta was asked to comment on the causation opinion in Dr. Li's deposition testimony. Dr. Paletta noted that when he formulated his reports, he did not have information regarding Dr. Li's observations during claimant's second surgery. Thus, the question posed to him contained "new information" that had not been previously provided. According to Dr. Paletta, based on the information available to him, it appeared that claimant's previous labral repair had healed completely and there was no evidence of a loose anchor. Dr. Paletta testified if there was evidence to suggest that the previous labral tear had not completely healed, there was a failure of one of the anchors, and the new tear extended from the area of the old tear upwards, it would be his opinion that the second injury was due to incomplete healing of the first repair and an extension of the first tear and not a completely isolated second injury. Thus, based on this additional information from Dr. Li's deposition, Dr. Paletta opined that the second set of injuries occurred because of the failure of the first injury to have adequately healed.

¶ 33 E. Dr. Paletta's November 19, 2015, Deposition

¶ 34 Over the objection of claimant and Henkels, Dr. Paletta testified at a second deposition on November 19, 2015. Dr. Paletta testified that when he previously testified, he was not aware that claimant had undergone a second operation and he did not have the operative report available to him. Since that testimony, Dr. Paletta reviewed the operative report and arthroscopic photos of the second surgery and prepared a supplemental report of his findings.

¶ 35 Dr. Paletta testified that the "most salient line" from Dr. Li's operative report was a statement that Dr. Li had "evaluated the site of previous repair and it was loose and [he] could see that the dislocation had caused one of the anchors to pull loose." In addition, Dr. Li performed a biceps tenodesis, which was not indicated at the time of the initial surgery. After reviewing the additional records and photos, Dr. Paletta's diagnosis was "a recurrent tear of the anterior labrum as well as a new tear of the superior labrum or so called SLAP tear." Dr. Paletta opined that the second surgery was attributable to the two throwing accidents. Dr. Paletta testified that he changed his opinion from the prior testimony because "the operative report clearly documented that there was a new area of the labrum that was involved with the tear that was not present previously" and Dr. Li's impression was that the anchor was loose "as a consequence of the dislocation episodes." According to Dr. Paletta, anchors typically fail as a result of trauma. He stated that if an anchor fails for any other reason, there is typically evidence of resorption of bone around the anchor, a condition called osteolysis. However, Dr. Li did not document that condition at the time of the second surgery. Dr. Patella added that

claimant had made a full recovery and had returned to full duty. Dr. Li did not document any residual signs or symptoms of instability at the time he released him. Further, by claimant's own admission, when Dr. Patella took his history, he was doing well up until those two incidents.

¶ 36 On cross-examination by the attorney for Henkels, Dr. Paletta testified that he received 64 pages of additional material from claimant's attorney on October 2, 2015, the day after his first deposition. Dr. Paletta noted that the most recent medical record he received as part of that package was Dr. Li's note of August 20, 2015, which was prior to his original deposition. He was not asked to review Dr. Li's deposition testimony, although during his initial deposition, there was a break to allow him to review Dr. Li's testimony.

¶ 37 Dr. Paletta further testified that, as part of the 64-page package, he received intraoperative photographs. Dr. Paletta agreed that in his report he stated that the intraoperative photos were not helpful in differentiating the mechanism of loosening of the anchor. He added that there was no picture of a loose anchor in the photographs. Dr. Patella also noted that there was no photo of the chondral damage documented by Dr. Li. Dr. Patella agreed that what Dr. Li could visualize with his own eyes during the surgery, he did not have the opportunity to review with respect to those two factors (loose anchor and chondral change).

¶ 38 Dr. Patella testified that the last note he had from Dr. Li after the first surgery was from March 11, 2015, releasing claimant to full duty. Dr. Patella agreed that if there was no specific note declaring claimant at MMI, it was fair to say that Dr. Li did not believe that claimant's condition had reached a state of MMI as of March 11, 2015. Dr. Patella testified that he was not aware that Dr. Li had requested claimant to follow up with him a few weeks after he returned to work. He agreed that when he tells his patients that he wants to see them in four weeks, it is because he wants to continue to monitor and assess the condition for which they are being treated.

¶ 39 On redirect-examination, Dr. Paletta testified that he was provided color intraoperative photographs by email, but he printed them out in black and white to review because he does not do well reviewing photos on a computer. After reviewing the color photographs at the deposition, Dr. Paletta could still not see the loose anchor or evidence of chondral damage, although he did note evidence of the loosening of the previous repair and of the SLAP tear. Dr. Paletta stated that he saw nothing different in the color pictures as compared to the black and white photographs. In commenting on Dr. Li's reference to the temporal relationship between the second injury and the initial surgery, Dr. Paletta noted that there was no discussion of a second surgery prior to the throwing accidents taking place. Dr. Paletta also noted that the SLAP tear was not present or documented by Dr. Li at the first surgery but was present and documented as part of the second surgery. Dr. Paletta added that although the new area of tear "may connect or communicate" with the old area of tear, it clearly involved a new area of the labrum that had not been involved previously. Dr. Paletta added that Dr. Li attributed the loose anchor to the second dislocation. Finally, Dr. Paletta testified that the fact that Dr. Li did not place claimant at MMI did not have any effect on his opinion because Dr. Li believed claimant was able to perform all of his work duties.

¶ 40                                    F. Arbitrator's Decision

¶ 41 Based on the foregoing evidence, the arbitrator found that claimant sustained three accidents and that his condition of ill-being was causally related to all three accidents.

Specifically, the arbitrator concluded that claimant's right shoulder treatment through March 11, 2015, was causally related to the accident claimant sustained on June 16, 2014, while in respondent's employ, and that claimant's right shoulder treatment after April 1, 2015, was causally related to the accidents claimant sustained on April 1 and April 3, 2015, while in Henkels's employ. In so finding, the arbitrator essentially determined that the April 2015 accidents constituted intervening accidents breaking the causal connection from the initial accident. In support of this finding, the arbitrator cited (1) the change in claimant's subjective complaints after the April 2015 incidents, *e.g.*, reports of increased pain and instability, (2) a "clear change in pathology" following the April 2015 incidents as evidenced by a new labral tear and a loosened anchor, (3) the lack of evidence that Dr. Li contemplated additional surgery for claimant prior to the April 2015 incidents, and (4) the fact that claimant was able to work full duty before the April 2015 accidents. The arbitrator also found the causation opinion of Dr. Paletta more persuasive than that of Dr. Li. In this regard, the arbitrator questioned why Dr. Li would release claimant to return to full duty if he had not completely healed.

¶ 42     In light of his findings, in case No. 14 WC 37190, the arbitrator awarded claimant $23^6/_7$ weeks of TTD benefits from respondent, covering the period from September 26, 2014, through March 11, 2015. The arbitrator concluded that respondent was liable for claimant's medical expenses, but only those incurred prior to March 11, 2015. In case Nos. 15 WC 19322 and 15 WC 19323, the arbitrator awarded claimant an additional $37^2/_7$ weeks of TTD benefits from Henkels, covering the period from April 6, 2015, through December 22, 2015. In addition, the arbitrator ordered Henkels to pay for claimant's medical expenses incurred after April 1, 2015, as well as his prospective medical treatment.

¶ 43                              G. Commission Decision

¶ 44     Henkels and respondent sought review of the arbitrator's decision before the Commission. In case No. 14 WC 37190, the Commission modified the arbitrator's decision in part but otherwise affirmed and adopted the decision of the arbitrator. Specifically, the Commission affirmed the arbitrator's finding that claimant sustained three distinct accidents on June 16, 2014; April 1, 2015; and April 3, 2015, but determined that the two accidents sustained in April 2015 did not constitute intervening accidents sufficient to break the causal connection from the initial accident. Rather, the Commission concluded that claimant's current condition of ill-being was causally related to the June 2014 accident and that respondent was liable for all medical expenses and benefits resulting from claimant's injuries. In addition, the Commission remanded the cause to the arbitrator for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

¶ 45     In support of its decision, the Commission found the opinion of Dr. Li more persuasive than that of Dr. Paletta. The Commission explained that Dr. Li personally observed the pathology of claimant's shoulder during surgery. Based on his observations, Dr. Li opined that the original injury had not completely healed at the time claimant began to work for Henkels and that the labral tear from the April 2015 incidents was an extension of the tear from the June 2014 accident. As such, Dr. Li related claimant's current condition of ill-being to the June 2014 injury. Dr. Li also cited the proximity between the April 2015 accidents and claimant's first operation as a factor.

¶ 46     The Commission also found significant that when Dr. Li released claimant to full duty on March 11, 2015, he did not declare claimant at MMI, he did not release claimant from

- 10 -

treatment, and he scheduled a follow-up appointment for claimant. The Commission stated that by opining that claimant had not completely healed from the initial injury at the time he released claimant to work, Dr. Li "tacitly accept[ed] that he may have released [claimant] prematurely to work full duty in a heavy physically demanding level occupation." The Commission found that Dr. Li's admission that claimant had not fully healed from when he released claimant to work, rendered his testimony "more persuasive rather than less persuasive."

¶ 47    The Commission also cited the facts that claimant was never symptom free following his initial surgery and that the only FCE, which was administered in January 2015, found that claimant was unable to return to his previous job. In reference to the former, the Commission observed that the medical records showed that claimant complained of continued pain throughout his therapy, he still had pain and weakness when he returned to work, and he returned to work because of Dr. Li's release, not because he felt ready to return to his position.

¶ 48    Finally, citing to *Vogel v. Hogan Plumbing*, Ill. Workers' Comp. Comm'n, 98-WC-42870 (Oct. 22, 2003), *aff'd & remanded by Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780 (2005), the Commission further determined that even if all three accidents constituted concurrent causes of claimant's condition of ill-being, that finding would not be sufficient for the April 2015 incidents to become independent intervening accidents, thereby breaking the chain of causation from the initial accident on June 16, 2014.

¶ 49    In case Nos. 15 WC 19322 and 15 WC 19323, the Commission reversed the decision of the arbitrator, finding that claimant failed to sustain his burden of proving a causal connection between the April 2015 accidents and his current condition of ill-being.

¶ 50                              H. Trial Court Decision

¶ 51    Respondent sought judicial review of the Commission's decisions in the circuit court of Peoria County. Meanwhile, claimant sought judicial review of the Commission's decisions in the circuit court of Marion County. Claimant's appeal was later transferred to Peoria County and consolidated with respondent's appeal. Following a hearing, the circuit court of Peoria County confirmed the decisions of the Commission. This appeal by respondent followed.[1]

¶ 52                              II. ANALYSIS

¶ 53    On appeal, respondent raises two issues. First, respondent argues that the Commission's decision was contrary to the analysis outlined in *National Freight Industries v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120043WC, and, therefore, the arbitrator's decision should be reinstated. Alternatively, respondent contends that the Commission's finding that claimant's current condition of ill-being is causally related to the June 16, 2014, accident was against the manifest weight of the evidence. We address these arguments in turn.

---

[1]Claimant filed a notice of cross-appeal. However, on Henkels's motion, we dismissed the cross appeal for want of jurisdiction.

- 11 -

A. *National Freight Industries v. Illinois Workers' Compensation Comm'n*

¶ 55    Initially, respondent relies on this court's analysis in *National Freight Industries v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120043WC, to argue that the Commission's decision was contrary to law. In support of its position, respondent asserts there is a conflict between "the line of cases that hold an employer takes an employee as they [*sic*] find them [*sic*] and intervening accident cases where the subsequent work-related accidents occur." Respondent requests that we resolve this alleged conflict "with an interpretation that distinguishes between subsequent work-related and non-work-related accidents." According to respondent, we outlined such an approach in *National Freight Industries*, which sets forth a factor-based analysis to address causation where a subsequent work-related accident is at issue, yet the Commission failed to apply this analysis to the instant case. Respondent maintains that an application of the factor-based analysis developed in *National Freight Industries* supports a finding that claimant experienced intervening accidents that broke the causal chain on April 1 and April 3, 2015, while he was in the employ of Henkels.

¶ 56    As respondent observes, employers take their employees as they find them. *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 199 (2002). Thus, even though an employee has a preexisting condition that may make him or her more vulnerable to injury, recovery for an accidental injury will not be denied as long as the employee establishes that the employment was *a* causative factor in the resulting condition of ill-being. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). For this reason, the relevant inquiry in preexisting-condition cases is whether the employee's condition is attributable solely to a degenerative process of the preexisting condition or to the aggravation or acceleration of the preexisting condition resulting from a work-related accident. *Id.* at 204-05. Under an independent intervening cause analysis, compensability for an ultimate injury or disability is based upon a finding that the employee's condition was caused by an event that would not have occurred "but for" the original injury. *International Harvester Co. v. Industrial Comm'n*, 46 Ill. 2d 238, 245 (1970). That the other event, whether work-related or not, may have aggravated the employee's condition is irrelevant. *Vogel*, 354 Ill. App. 3d at 786. An employer is relieved of liability only if the intervening cause completely breaks the causal chain between the original work-related injury and the ensuing condition of ill-being. *Global Products v. Illinois Workers' Compensation Comm'n*, 392 Ill. App. 3d 408, 411 (2009).

¶ 57    In arguing that there is a conflict between these two lines of cases, respondent asserts that under a preexisting-condition analysis, claimant "would not have [been] prevented *** from claiming Henkels was liable for a work-related injury if he had hypothetically originally injured his shoulder at home as opposed to while working for [respondent]" whereas "the intervening accident case law, and the 'whether work-related or not' language cited in [intervening-accident cases], likely leads to an opposite result—that the pre-existing condition precludes a finding that Henkels is liable." Although inartfully phrased, respondent seems to suggest that a conflict exists between these lines of cases because recovery is permitted under a preexisting-condition analysis if the employee establishes that his or her employment was *a* causative factor in the resulting condition of ill-being, but under an independent intervening cause analysis, an employer is relieved of liability only if the intervening event *completely* breaks the causal chain between the original work-related injury and the ensuing condition of ill-being. In other words, respondent would have us limit an employer's liability in intervening cause cases if a subsequent event was *a* causative factor in the employee's resulting condition

of ill-being. However, respondent cites no authority for such a position. Indeed, this is clearly not the law in Illinois. See *International Harvester Co.*, 46 Ill. 2d at 247 (rejecting apportionment of compensation involving multiple accidents); see also *National Freight Industries*, 2013 IL App (5th) 120043WC, ¶ 26 ("Every natural consequence that flows from an injury that arose out of and in the course of one's employment is compensable under the Act absent the occurrence of an independent intervening accident that breaks the chain of causation between the work-related injury and an ensuing disability or injury."); *Dunteman v. Illinois Workers' Compensation Comm'n*, 2016 IL App (4th) 150543WC, ¶ 42; *Teska v. Industrial Comm'n*, 266 Ill. App. 3d 740, 742 (1994); *Boatman v. Industrial Comm'n*, 256 Ill. App. 3d 1070, 1074 (1993)). Respondent advances no cogent reason to overturn this well-established precedent.

¶ 58    Moreover, contrary to respondent's claim, we did not set forth a test in *National Freight Industries* for determining whether a subsequent work-related event constitutes an independent intervening cause that severs the chain of causation from an earlier work injury. In *National Freight Industries*, the claimant sustained an injury on November 6, 2006, while working for Fischer Lumber. *National Freight Industries*, 2013 IL App (5th) 120043WC, ¶ 4. On that date, the claimant was pulling boxes off a truck when he felt a "pop" in his low back followed by a sharp pain that radiated to his right leg. *Id.* On December 4, 2008, one day before the claimant was scheduled to undergo a right L3-4 microdiscectomy, he was involved in a motor vehicle accident while working for National Freight Industries. *Id.* ¶¶ 8-9. At the time of the motor vehicle accident, the claimant felt a "pop" on the left side of his back and began to immediately experience a sharp pain down his left side and low back as well as numbness and tingling down his left leg. *Id.* ¶ 9. Thereafter, the claimant's doctor recommended he undergo a lumbar laminectomy and fusion with stabilization at L3-4 and L4-5. *Id.* ¶ 14. The Commission found that the motor vehicle accident constituted an independent intervening cause that broke the chain of causation between the claimant's condition of ill-being and his November 2006 work injury. *Id.* ¶ 20.

¶ 59    After analyzing the evidence in *National Freight Industries*, we concluded that it was reasonable for the Commission to conclude that the motor vehicle accident resulted in more than a mere aggravation of the injuries the claimant sustained in the initial work accident. *Id.* ¶ 33. In support of this holding, we cited evidence that following the motor vehicle accident there were changes in (1) the claimant's symptoms and the intensity of his pain, (2) the pathology of the claimant's condition, (3) the nature of the surgical intervention, and (4) the claimant's ability to work. *Id.* ¶¶ 29-32. Because there was sufficient evidence in the record to support the Commission's causation finding, we held that the Commission's decision was not against the manifest weight of the evidence. *Id.* ¶ 33.

¶ 60    Respondent attempts to use our analysis in *National Freight Industries* to support its argument that the Commission's finding regarding causation is contrary to law. In particular, respondent asserts that in *National Freight Industries*, we identified four factors to assess whether a subsequent work-related event constitutes an independent intervening cause that severs the chain of causation from an earlier work injury. Contrary to respondent's claim, however, we did not set forth such a test in *National Freight Industries*. Rather, we merely recounted the evidence in the record that supported the Commission's resolution of the issue. For the aforementioned reasons, we reject respondent's claim that the Commission's finding regarding causation was contrary to law.

¶ 62      Alternatively, respondent argues that the Commission's finding that claimant's current condition of ill-being is causally related to the June 16, 2014, accident is against the manifest weight of the evidence. According to respondent, claimant's accidents on April 1 and April 3, 2015, while he was working for Henkels, constituted independent intervening accidents because there was no evidence that the April 2015 dislocation episodes were natural consequences of the June 2014 accident.

¶ 63      To obtain compensation under the Act, an employee must establish by a preponderance of the evidence a causal connection between a work-related injury and the employee's condition of ill-being. *Vogel*, 354 Ill. App. 3d at 786. Every natural consequence that flows from a work-related injury is compensable under the Act unless the chain of causation is broken by an independent intervening accident. *National Freight Industries*, 2013 IL App (5th) 120043WC, ¶ 26; *Vogel*, 354 Ill. App. 3d at 786; *Teska*, 266 Ill. App. 3d at 742. Under an independent intervening cause analysis, compensability for an ultimate injury or disability is based upon a finding that the employee's condition was caused by an event that would not have occurred "but for" the original injury. *International Harvester Co.*, 46 Ill. 2d at 245. Thus, when an employee's condition is weakened by a work-related accident, a subsequent accident, whether work related or not, that aggravates the condition does not break the causal chain. See *Lee v. Industrial Comm'n*, 167 Ill. 2d 77, 87 (1995); *Vogel*, 354 Ill. App. at 787; *Lasley Construction Co. v. Industrial Comm'n*, 274 Ill. App. 3d 890, 893 (1995). "For an employer to be relieved of liability by virtue of an intervening cause, the intervening cause must completely break the causal chain between the original work-related injury and the ensuing condition." *Global Products*, 392 Ill. App. 3d at 411. As long as there is a "but for" relationship between the work-related injury and subsequent condition of ill-being, the first employer remains liable. *Global Products*, 392 Ill. App. 3d at 412.

¶ 64      Whether a causal connection exists between an employee's condition of ill-being and a particular work-related accident presents a question of fact. *Vogel*, 354 Ill. App. 3d at 786; see also *Bell & Gossett Co. v. Industrial Comm'n*, 53 Ill. 2d 144, 148 (1972) (whether an accident constitutes an independent, intervening cause is a question of fact for the Commission); *Bailey v. Industrial Comm'n*, 286 Ill. 623, 626 (1919) (same). In resolving factual matters, it is the function of the Commission to assess the credibility of the witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences therefrom. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). This is especially true with respect to medical issues, where we owe heightened deference to the Commission due to the expertise it has long been recognized to possess in the medical arena. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). A reviewing court may not substitute its judgment for that of the Commission on factual matters merely because other inferences from the evidence may be reasonably drawn. *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 407 (1984). We review the Commission's factual determinations under the manifest-weight-of-the-evidence standard. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987). Thus, we will overturn the Commission's causation finding only if an opposite conclusion is clearly apparent. *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120564WC, ¶ 21.

¶ 65      In this case, the Commission concluded that the accidents occurring on April 1 and April 3, 2015, did not constitute independent intervening accidents that severed the chain of causation

between claimant's current condition of ill-being and the accident occurring on June 16, 2014, while claimant was in respondent's employ. Stated differently, the Commission determined that claimant's condition of ill-being after April 2015 would not have resulted "but for" his original work injury. After reviewing the record, we cannot say that a conclusion opposite that of the Commission is clearly apparent.

¶ 66      It is undisputed that claimant injured his right shoulder on June 16, 2014, while working for respondent. At that time, Dr. Li diagnosed a right shoulder tear due to dislocation. Dr. Li recommended surgical repair and eventually performed a right shoulder arthroscopy, which involved repairing the labral tear and anchoring sutures into the bone. Postoperatively, claimant underwent physical therapy, an FCE, and work conditioning. On March 11, 2015, Dr. Li released claimant to full duty without restrictions, but instructed claimant to follow up with him in four weeks. On April 1, 2015, claimant redislocated his shoulder when he threw a roll of electrical tape to a co-worker in a bucket lift. Claimant injured his shoulder a third time on April 3, 2015, after throwing a wire grip to a coworker in a bucket lift. On April 6, 2015, claimant reported to Dr. Li's office for his prescheduled appointment. At that time, claimant reported the two throwing incidents. Dr. Li diagnosed a SLAP tear and later performed a second operation to repair the same. During the surgery, Dr. Li also removed a loose anchor from the first operation.

¶ 67      Dr. Li was of the opinion that the accidents of April 2015 did not constitute independent intervening accidents, breaking the chain of causation between claimant's condition of ill-being and the June 2014 injury. Dr. Li explained that the June 2014 shoulder accident made claimant more susceptible to dislocation and claimant had not completely healed from the surgery performed after the first dislocation. Dr. Li testified that the throwing accidents in April 2015 redislocated claimant's shoulder, pulled out an anchor that was inserted to repair the labrum at the first surgery, and resulted in the subsequent SLAP tear. Dr. Li further testified that the SLAP tear was an extension of the labral tear claimant sustained as a result of the June 2014 accident. Dr. Paletta agreed that claimant sustained a SLAP tear as a result of the April 2015 accidents. However, Dr. Paletta opined that this was a new tear without any disruption of the labral tear sustained in June 2014. In support of this conclusion, Dr. Patella testified that by March 2015, claimant had made a full recovery with no residual signs or symptoms of instability and had been returned to full duty. Dr. Patella acknowledged that claimant had a loose anchor, but attributed the condition to trauma, since Dr. Li did not document osteolysis at the second surgery and osteolysis was the only other condition that would cause the anchor to fail.

¶ 68      As the foregoing establishes, the Commission was presented with conflicting causation opinions. As noted above, it is the function of the Commission to decide questions of fact and causation, to judge the credibility of the witnesses, and to resolve conflicting medical evidence. *Hosteny*, 397 Ill. App. 3d at 674. In resolving this conflict, the Commission found the causation opinion of Dr. Li more persuasive than that of Dr. Paletta. In this regard, the Commission noted that Dr. Li personally observed the pathology of claimant's shoulder during surgery. Based on that observation, Dr. Li opined that the original injury had not completely healed and the first injury caused the shoulder to dislocate after claimant threw a roll of tape. Dr. Li also related claimant's condition of ill-being after April 2015 to the initial injury based on his finding that the SLAP tear was an extension of claimant's June 2014 labral tear and the proximity between the first surgery and the second injury. The Commission also found

noteworthy that while Dr. Li released claimant to full duty on March 11, 2015, he did not declare him at maximum medical improvement and did not release claimant from treatment. Given the Commission's fact-finding role and the expertise it possesses in the medical arena, we cannot say that its decision to adopt the causation opinion of Dr. Li over that of Dr. Paletta was against the manifest weight of the evidence.

¶ 69    Despite the foregoing record, respondent contends that there is no testimony or evidence that the April 2015 dislocation episodes were a natural consequence of the June 2014 accident. In support of this argument, respondent contends that Dr. Li testified that "but for the April 2015 accidents, [claimant's] dislocation episodes would not have occurred and [he] would not have required additional surgery." However, as stated above, under an independent intervening cause analysis, compensability for an ultimate injury or disability is based upon a finding that the employee's condition was caused by an event that would not have occurred "but for" the *original* injury. *International Harvester Co.*, 46 Ill. 2d at 245 (observing that the "but for" rationale has been extended to cases where the event immediately causing the second injury was not itself caused by the first injury, yet but for the first injury, the second event would not have been injurious). Here, Dr. Li testified that having experienced the first dislocation, claimant's pathology made him more susceptible to dislocation in the future. Dr. Li further testified that claimant had not completely healed from the original surgery when he began working for Henkels. As a result, claimant's shoulder was in a weakened state when the throwing incidents occurred, causing the shoulder to dislocate, the capsule to pull away, and the anchor to pull out. Thus, the evidence of record can reasonably be interpreted to support the Commission's inference that claimant's condition of ill-being after April 2015 would not have resulted "but for" his original work injury. See *id.* at 244-47 (affirming Commission's resolution of conflicting medical evidence in favor of the claimant regarding whether the claimant had fully recovered from the effects of his work-related brain injury when he was struck in the eye by his wife, causing an increase in his neurosis); *Lasley Construction Co.*, 274 Ill. App. 3d at 893-94 (affirming Commission's finding, based on medical evidence, that the claimant would not have suffered a herniated disc following chiropractic adjustments and flu but for his work-related injury).

¶ 70    In its decision, the Commission cited to *Vogel*, 354 Ill. App. 3d 780. Respondent claims that *Vogel* is distinguishable because in this case, unlike in *Vogel*, the evidence demonstrates that claimant had recovered following his first shoulder surgery and had been released to full duty work. However, the Commission did not cite to *Vogel* because it found the case factually similar. Rather, the Commission cited to *Vogel* for the proposition that a condition of ill-being can be attributable to concurrent causes but that such a finding is not sufficient for the subsequent accidents to break the causal chain from the initial accident. In any event, despite respondent's contention to the contrary, the evidence of record reasonably supports a finding that claimant had *not* completely recovered from his first surgery despite being released to return to work. First, the fact that an employee has returned to employment following a work-related injury does not alone establish that the employee has recovered from the injury. *International Harvester Co.*, 46 Ill. 2d at 244. Second, the evidence supports a finding that claimant had not completely healed by the time he returned to work. In this regard, although Dr. Li released claimant to return to work in March 2015, he did not find claimant at maximum medical improvement, he did not release claimant from his care, and he instructed claimant to follow up with him in four weeks. Dr. Li also opined that claimant's original surgery had not

- 16 -

fully healed at the time the April 2015 accidents occurred. Finally, we note that claimant testified that although his shoulder had progressed when Dr. Li released him to return to work, it was still weak and painful. Claimant related that he returned to work only because he was released to do so, and he thought his shoulder would improve with work. That claimant had not fully recovered at the time he was released to return to work is also evidenced by the fact of his April 2015 injuries while he was performing activities common to his job.

¶ 71     For the reasons stated above, we hold that the Commission's finding that the April 2015 accidents did not constitute independent intervening causes sufficient to break the causal connection between claimant's current condition of ill-being and his June 2014 work-related accident was not against the manifest weight of the evidence.

¶ 72                                      III. CONCLUSION

¶ 73     For the reasons set forth above, we affirm the judgment of the circuit court of Peoria County, which confirmed the decision of the Commission. This cause is remanded to the Commission for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327.

¶ 74     Affirmed and remanded.