BRIAN VOGEL, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Hogan's Plumbing, Inc., Appellant).—HOGAN'S PLUMBING, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Brian Vogel, Appellee).

Second District (Industrial Commission Division)    Nos. 2—04—0291WC, 2—04—0293WC cons.

Opinion filed January 4, 2005.

Paul W. Pasche, of Brady, Connolly & Masuda, P.C., of Chicago, for appellant.

James J. Marszalek, of Marszalek & Marszalek, of Chicago, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

## I. INTRODUCTION

Claimant, Brian Vogel, sustained cervical injuries while working for employer, Hogan's Plumbing, Inc. An arbitrator awarded claimant 45 weeks of temporary total disability (TTD) benefits and $32,987.80 in medical expenses. The arbitrator found that injuries claimant received as a result of three automobile accidents broke the causal chain and therefore that his current condition of ill-being was not causally related to his work injury. The Industrial Commission[1] (Commission) adopted the arbitrator's findings. On judicial review, the trial court found that the Commission's decision was against the manifest weight of the evidence and contrary to law. On remand, the Commission awarded claimant 85 weeks of TTD benefits and $36,915 in medi-

---

[1]The name of the Industrial Commission was changed to the Illinois Workers' Compensation Commission on January 1, 2005. However, for the sake of consistency, we will continue to use "Industrial Commission" in this case.

cal expenses and ordered employer to authorize surgery prescribed by claimant's treating physician. The trial court confirmed the Commission's decision on remand. On appeal, employer argues that the trial court erred in holding that the Commission's decision was against the manifest weight of the evidence. We affirm.

## II. BACKGROUND

The arbitration hearing took place on August 23, 2001. Claimant began working for employer on June 22, 1998. On July 10, 1998, he was delivering a whirlpool tub to a customer's home. While dragging the tub, which weighed 275 to 300 pounds, he tripped over some debris. Claimant felt pain in his neck that radiated down his right arm and into his fingers. Claimant reported the accident upon returning to employer's office. He continued working until July 26, 1998, when he went to the emergency room at Central Du Page Hospital.

Claimant saw Dr. Harb Boury, a neurosurgeon, on July 29, 1998. Dr. Boury diagnosed herniated discs at C4-C5 and C5-C6 and a bulging disc at C6-C7 and also noted his impression that claimant had a congenitally narrow cervical spinal canal. Dr. Boury ordered claimant off of work.

Claimant underwent surgery on March 12, 1999. Dr. Boury performed an anterior cervical discectomy and fusion at C4-C5 and C5-C6. During his deposition, Dr. Boury testified that claimant's fusion had been progressing nicely. According to Dr. Boury, a person with a job like claimant's typically would not be able to return to work until about six months after the surgery. On April 26, 1999, Dr. Boury reported that X rays showed that the graft height and alignment were well maintained. The bone graft was beginning to fuse but was not yet solid. On June 7, 1999, Dr. Boury reported that an X ray taken on June 4, 1999, showed that the alignment was good and the height of the graft was maintained, but the fusion was not completely solid. He advised claimant to wean himself off of his rigid neck brace over the next 7 to 10 days and, after that period, to continue to wear the brace while driving.

Claimant testified that he "was doing fine" and was experiencing no pain until he was involved in an automobile accident on June 9, 1999. Another car hit claimant's vehicle from behind while claimant was traveling to his first session of physical therapy. Claimant was wearing a soft brace at the time. After the accident, claimant experienced pain in his neck, shoulder, and arm.

Claimant saw Dr. Boury on June 10, 1999, and informed him about the auto accident. Dr. Boury reviewed the X rays taken at the emergency room and determined that the bone graft remained in

place and the alignment remained satisfactory. He advised claimant to wear a rigid neck brace for another six weeks.

Claimant saw Dr. Boury again on June 14, 1999. Claimant complained of pain in the upper part of his right arm. The pain radiated downward but not all the way into his hand. Dr. Boury testified that claimant's symptoms were "almost like a throw back to" what claimant experienced before the surgery. On July 12, 1999, claimant informed Dr. Boury that he had taken a job delivering pizzas. Dr. Boury advised claimant that such work was appropriate because it was "not a physical job." An X ray taken on July 24, 1999, showed that the graft was in a good position and the alignment was satisfactory.

A functional capacity evaluation conducted on August 16, 1999, concluded that claimant was able to lift 50 pounds occasionally and could function in a job requiring a medium physical demand level. Claimant's job with employer was rated at the very heavy physical demand level. Claimant underwent two weeks of work hardening but was unable to achieve any physical or functional gains. On August 30, 1999, Dr. Boury authorized claimant to return to work within the restrictions prescribed in the functional capacity evaluation.

Claimant remained symptomatic, and, in September 1999, Dr. Boury referred claimant to Dr. Steven Baker, an orthopaedic surgeon. In his referral letter to Dr. Baker, Dr. Boury related claimant's complaint that "ever since the car accident, my shoulder never felt the same." Dr. Baker noted that claimant's condition failed to improve with physical therapy and referred claimant back to Dr. Boury.

On October 5, 1999, claimant underwent a myelogram and post-myelogram CT scan. These studies showed a slight narrowing of the neuroforamina on the right side at C5-C6. Dr. Boury advised claimant that he probably would develop pseudoarthrosis, or a failed fusion, at that level and referred him to Dr. Fred Geisler, a neurosurgeon. Dr. Geisler examined claimant. A CT scan performed at Dr. Geisler's behest on November 5, 1999, revealed a failed fusion, at C5-C6.

Dr. Boury testified that he wanted to attempt conservative treatment before considering surgery. He advised claimant to wear a neck brace in the hope that the external fixation would help the fusion to become solid. Also, he prescribed physical therapy. When the conservative treatment concluded, Dr. Boury believed that claimant required a second surgery, including an additional graft and plating.

Dr. Boury opined that the problems claimant experienced after the auto accident were caused primarily by the auto accident and not claimant's work accident. According to Dr. Boury:

"The accident clearly played a major role in his worsening clini-

cal condition. And *** what's unfortunate is the timing of the accident, that the accident happened not quite three months *** from the anniversary of his surgery; that a fusion is not solid by that time, *** and, therefore, the accident clearly will set back the fusion and sometimes may lead into a pseudoarthrosis, which [proved] to be the case."

Thus, Dr. Boury believed that, if claimant had not been involved in the auto accident, he probably would not have developed pseudoarthrosis. He explained that pseudoarthrosis "is a very specific term used to describe the *** lack of a bony fusion. In and of itself, it implies a pre-existing operation."

Claimant was involved in a second automobile accident on April 7, 2000. Again, he was struck from the rear. Claimant complained of pain in his left shoulder and arm, pain in his lower back, pain in his right upper arm, and numbness in his right middle finger and right ring finger. X rays taken at the emergency room showed the incomplete fusion at C5-C6 and the narrowing of the neural foramina at C4-C5 and C5-C6.

Claimant was involved in a third accident on June 18, 2000, when he struck a vehicle that had pulled out in front of him. Claimant's head struck the windshield. Emergency room X rays revealed the incomplete fusion at C5-C6, effusion at C4-C5, and narrowing at C6-C7. Dr. Boury opined that "[a]ll these accidents are aggravating the pre-existing condition which is pseudoarthrosis at [C]5-[C]-6. The pseudoarthrosis is *** a result of the first accident of 6-9-99."

Claimant acknowledged that he exercised at a health club regularly from March 1, 2000, until May 31, 2000. He rode a stationary bicycle and did some weight training, mostly using his legs. He did upper body work to the extent he could tolerate it and lifted no more than 25 to 50 pounds. Claimant worked full-time as a driver for Black Gold Septic from March 13, 2000, until April 24, 2001. Claimant injured his ankle while working for Black Gold Septic and, at the time of the hearing, was receiving TTD benefits for that injury. At the time of the hearing, claimant had lawsuits pending against the other drivers involved in claimant's first and third auto accidents.

At employer's request, Dr. Gary Skaletsky, a neurosurgeon, examined claimant on March 8, 2001, and reviewed claimant's medical records. He opined that the graft at C5-C6 failed to fuse "for inherent biological reasons" and that the June 9, 1999, auto accident did not contribute to claimant's pseudoarthrosis. According to Dr. Skaletsky, the auto accident at most would have delayed the fusion but would not have prevented the fusion from occurring. He added that the post-accident studies showing that the bone graft remained properly aligned

indicated that the accident did not contribute to claimant's condition. Accordingly, he opined that the automobile accidents did not contribute in any way to claimant's current condition. Dr. Skaletsky believed that one cause contributing to claimant's pseudoarthrosis was his failure to comply with Dr. Boury's directive to wear a rigid brace while driving. He explained that any activity that causes hypermobility of the neck while fusion is occurring could delay the fusion and lead to pseudoarthrosis. Also, he believed that claimant's work at Black Gold Septic was inappropriate given claimant's work restrictions and was probably a factor contributing to claimant's condition.

The arbitrator awarded claimant TTD benefits from July 28, 1998, until June 9, 1999, or 45 weeks, and $32,987.80 in medical expenses. Relying on Dr. Boury's opinion, the arbitrator found that the auto accidents "further aggravated [claimant's] medical condition and resulted in the need for additional medical treatment and lost time." Accordingly, claimant's current condition of ill-being was not causally related to the July 10, 1998, work injury. The Commission adopted the arbitrator's decision.

Claimant sought judicial review. On October 7, 2002, the trial court ruled that the Commission's decision was "contrary to law and [against] the manifest weight of the evidence in that the 6/9/99 auto accident and subsequent auto accidents did not break the chain of causation between [claimant's] 7/10/98 work accident and his pseudoarthrosis, in that the work and auto accidents were concurrent causes." The trial court remanded the cause to the Commission with instructions to enter an award consistent with the court's ruling. Employer appealed the trial court's ruling, but this court dismissed the appeal because a final judgment had not yet been entered. *Vogel v. Industrial Comm'n*, No. 2—02—1211 (2003) (unpublished order under Supreme Court Rule 23).

On remand, the Commission awarded claimant TTD benefits from July 28, 1998, through March 13, 2000, or 85 weeks, and $36,915 in medical expenses and found that claimant was entitled to the second surgery that Dr. Boury had recommended. The trial court confirmed the Commission's decision, and employer timely appealed.

### III. DISCUSSION

On appeal, employer argues that the trial court erred in setting aside the Commission's original decision that the auto accidents were intervening events that broke the causal connection between claimant's work injury and his current condition of ill-being. Where, as here, the trial court reverses the Commission's initial decision and the Commission enters a new decision on remand, this court must

decide whether the Commission's initial decision was proper. *Inter-City Products Corp. v. Industrial Comm'n*, 326 Ill. App. 3d 185, 196 (2001).

■ To obtain compensation under the Workers' Compensation Act (820 ILCS 305/2 (West 2002)), a claimant must show by a preponderance of the evidence that he or she has suffered a disabling injury arising out of and in the course of his or her employment. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). The "arising out of" component addresses the causal connection between a work-related injury and the claimant's condition of ill-being. *Sisbro*, 207 Ill. 2d at 203. A claimant need prove only that some act or phase of his or her employment was a causative factor in the ensuing injury. *Twice Over Clean, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 638, 643 (2004), *appeal allowed*, 211 Ill. 2d 617 (2004). A work-related injury need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro*, 207 Ill. 2d at 205.

■ Every natural consequence that flows from an injury that arose out of and in the course of the claimant's employment is compensable unless caused by an independent intervening accident that breaks the chain of causation between a work-related injury and an ensuing disability or injury. *Teska v. Industrial Comm'n*, 266 Ill. App. 3d 740, 742 (1994). That other incidents, whether work-related or not, may have aggravated the claimant's condition is irrelevant. *Lasley Construction Co. v. Industrial Comm'n*, 274 Ill. App. 3d 890, 893 (1995); see also *International Harvester Co. v. Industrial Comm'n*, 46 Ill. 2d 238, 245 (1970) (where the work injury itself causes a subsequent injury, the chain of causation is not broken).

■ Whether a causal connection exists is a question of fact for the Commission, and a reviewing court will overturn the Commission's decision only if it is against the manifest weight of the evidence. *Navistar International Transportation Corp. v. Industrial Comm'n*, 331 Ill. App. 3d 405, 415 (2002). It is the Commission's duty to resolve conflicts in the evidence, particularly medical opinion evidence. *Navistar*, 331 Ill. App. 3d at 415. The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002). For the Commission's decision to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result. *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 729-30 (2000).

■ The trial court appropriately applied the causation principles discussed above in ruling that the Commission's original decision was

against the manifest weight of the evidence. This court has recognized repeatedly that, when the claimant's condition is weakened by a work-related accident, a subsequent accident that aggravates the condition does not break the causal chain. See *Lee v. Industrial Comm'n*, 167 Ill. 2d 77, 87 (1995). For example, in *Mendota Township High School v. Industrial Comm'n*, 243 Ill. App. 3d 834 (1993), the claimant injured his lower back while playing basketball in connection with his duties as an athletic coach. Less than one month later, the claimant aggravated his condition while playing racquetball. The claimant underwent conservative treatment, but his condition worsened. Several months later, the claimant suffered a sneezing episode while attending a high school football game. Immediately, he experienced excruciating lower-back pain that radiated down his leg. There was medical evidence that the basketball injury probably resulted in a tear of the posterior longitudinal ligament or of the annulus fibrosis, which weakened and ruptured during the sneezing episode.

The court noted that, although there was no dispute that the sneezing episode was the immediate cause of the rupture, it was not necessarily the sole cause. *Mendota*, 243 Ill. App. 3d at 837. "Had it not been for the original basketball injury, in all probability claimant's back problems would not have reached the stage they did in such a short period of time." *Mendota*, 243 Ill. App. 3d at 837. The court held that the Commission's finding that the racquetball injury and the sneezing episode were only contributing, not intervening, causes was not against the manifest weight of the evidence. *Mendota*, 243 Ill. App. 3d at 837-38; see also *International Harvester*, 46 Ill. 2d at 247 (evidence supported Commission's finding that claimant was suffering from a continuing condition of traumatic neurosis that resulted from a work-related head injury and that the existence of the condition was a causative factor in the total and permanent disability that occurred four years later when claimant's wife struck him); *Fermi National Accelerator Lab v. Industrial Comm'n*, 224 Ill. App. 3d 899, 908 (1992) (second fall involving use of crutches was not an intervening accident that broke the causal connection between condition of ill-being and first fall where claimant would not have been using the crutches but for the first injury).

This court has applied the above principles to overturn a Commission finding that a second accident broke the causal connection between the claimant's work injury and his subsequent condition of ill-being. In *Teska*, the claimant sustained a cervical injury while at work. He underwent surgery and was released to work about two months later. The claimant continued to experience numbness and pain. An MRI taken several months after the surgery revealed a recur-

rent herniated disc at the same level upon which the surgery was performed. About one year after the surgery, the claimant experienced sharp pain while bowling and did not return to work thereafter.

The court reasoned that merely because the claimant experienced an upsurge of neck pain while bowling did not mean that the causal connection was broken. *Teska*, 266 Ill. App. 3d at 742-43. According to the court, the claimant's condition would not have progressed to the point it did but for his original work-related accident. *Teska*, 266 Ill. App. 3d at 742. Because the claimant's work-related accident played a causative role in his current condition of ill-being, the Commission's decision to the contrary was against the manifest weight of the evidence. *Teska*, 266 Ill. App. 3d at 743.

Here, claimant's first auto accident clearly aggravated his condition resulting from his work-related injury. There is no dispute that, when claimant was involved in the first auto accident, he had not fully recovered from his surgery. Just before the first auto accident, Dr. Boury reported that the fusion was progressing nicely but was not complete. Claimant had not yet been released to full-duty work. Even if the accident was responsible for the failed fusion, such a condition could not have developed but for the surgery, which everyone agreed was necessary as a result of claimant's work injury.

The evidence that appears to support the Commission's initial decision is illusory. Claimant testified that he "was doing fine" and was experiencing no pain until he was involved in the first auto accident. This testimony about a lack of symptoms does nothing to change the fact that claimant was still recovering from the surgery and therefore was susceptible to complications such as pseudoarthrosis. The Commission relied on Dr. Boury's opinion that the first auto accident played a "major" role in claimant's worsening clinical condition. Dr. Boury's opinion, however, does nothing to eliminate claimant's work-related injury as a causative factor in his current condition of ill-being. Dr. Boury recognized that the timing of the auto accident shortly after the surgery, while claimant was still recovering, was a crucial factor. Also, he explained that the existence of pseudoarthrosis implies a previous surgery. Although Dr. Boury testified that the pseudoarthrosis would not have occurred but for the auto accident, it is equally true that the pseudoarthrosis would not have occurred but for claimant's work injury. Therefore, Dr. Boury's opinion merely established that the auto accident was a concurrent cause, along with the work injury.

The same analysis applies to the subsequent auto accidents. There was no evidence that the accidents changed the nature of the injury other than to aggravate it, and the need for the second surgery became

apparent before the second auto accident. Therefore, the inescapable conclusion is that claimant's work-related injury was a causative factor in his resulting condition.

We note that the arbitrator and the Commission never expressly found that the auto accidents broke the causal chain, but instead found merely that they "further aggravated [claimant's] medical condition." The law is clear, however, that the fact that other nonwork-related accidents may have aggravated claimant's condition is irrelevant.

In *Zion-Benton Township High School District 126 v. Industrial Comm'n*, 242 Ill. App. 3d 109, 114 (1993), and *Ditola v. Industrial Comm'n*, 216 Ill. App. 3d 531, 535-36 (1991), the courts upheld Commission decisions finding that the second accidents broke the causal chains. Those decisions are distinguishable. The claimants in those cases had returned to work after receiving treatment for their work injuries and had been working for several months at the times of their second accidents. Here, claimant was still recovering from surgery and had not yet been released to return to full-duty work.

## IV. CONCLUSION

For the foregoing reasons, the trial court properly ruled on October 7, 2002, that the Commission's initial decision was against the manifest weight of the evidence and remanded the cause so that the Commission could enter an award consistent with the court's ruling. The parties do not take issue with any aspects of the Commission's decision on remand.

Therefore, the judgment of the circuit court of Du Page County is affirmed and the cause is remanded for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

Affirmed and remanded to Industrial Commission.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE, and GOLDENHERSH, JJ., concur.