2025 IL App (5th) 250047WC-U

No. 5-25-0047WC

Order filed September 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| JACQUELYN SUMNER, | ) | Appeal from the Circuit Court |
| | ) | of St. Clair County. |
| Appellee, | ) | |
| | ) | |
| v. | ) | No. 24 MR 100 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION, *et al*. | ) | Honorable |
| | ) | Leah Captain, |
| (PlaceSmart/NOTS Logistics, Appellant). | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Holdridge and Justices Martin, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The Illinois Workers' Compensation Commission's finding that claimant's current condition of ill-being of her cervical spine is not causally related to her employment was not against the manifest weight of the evidence, and as such, the circuit court erred when it set aside the Commission's decision and remanded the matter.

¶ 2                            I. INTRODUCTION

¶ 3    Claimant, Jacquelyn Sumner, filed an application for adjustment of claim pursuant to the

Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2020)) seeking benefits for

injuries she allegedly sustained to her cervical spine and right shoulder while working for respondent PlaceSmart/NOTS Logistics. Following a hearing, the arbitrator concluded that claimant's current condition of ill-being with respect to her right shoulder is causally related to the work accident, but that claimant's current condition of ill-being with respect to her neck/cervical spine is not causally related to the work accident. As such, the arbitrator denied claimant's request for medical bills and prospective medical treatment related to the neck/cervical spine injury. The arbitrator also denied claimant's request for penalties and attorney fees pursuant to sections 16, 19(k), and 19(l) of the Act (820 ILCS 305/16, 19(k), 19(l) (West 2020)). A majority of the Illinois Workers' Compensation Commission (Commission) modified the decision of the arbitrator in part, but otherwise affirmed and adopted the arbitrator's decision and remanded the matter for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

¶ 4    On judicial review, the circuit court of St. Clair County confirmed that portion of the Commission's decision with respect to claimant's shoulder injury. However, the court set aside the Commission's finding that the injury to claimant's cervical spine is not causally connected to her workplace accident. The court awarded benefits in accordance with its finding, including medical and prospective medical treatment, and remanded the matter for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327. In this appeal, respondent argues that the Commission's causation finding with respect to the injury to claimant's cervical spine was not against the manifest weight of the evidence. We agree. Accordingly, we reverse that portion of the circuit court's order setting aside the Commission's finding that claimant's cervical spine injury was not causally related to her workplace accident, reverse any benefits awarded by the trial court with respect to the injury to the cervical spine, affirm the circuit court's order in all other respects, and remand for further proceedings.

¶ 5                                    II. ISSUE

¶ 6      1. Whether the Commission's finding that the current condition of ill-being of claimant's cervical spine is not causally related to her employment was against the manifest weight of the evidence.

¶ 7                                III. BACKGROUND

¶ 8      Claimant was employed by respondent, a temporary employment agency, and was working as a housekeeper at a Prairie Farms Dairy facility. On August 27, 2020, claimant was walking on a slick surface when "machinery grabbed ahold of [her] shirt, thereby suddenly jerking her right shoulder." On October 27, 2020, claimant filed an application for adjustment of claim, alleging injuries to her cervical spine and right shoulder. An arbitration hearing on claimant's application for adjustment of claim was held on September 30, 2022, before arbitrator William Gallagher, pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2020)). The issues in dispute included whether the alleged injury to claimant's cervical spine was caused by the August 27, 2020, accident and whether respondent is liable for a number of unpaid medical bills related to the treatment of claimant's cervical spine. The following factual recitation is taken from the evidence adduced at the arbitration hearing.

¶ 9                            A. Claimant's Testimony

¶ 10     Claimant testified that she was employed at Prairie Farms through respondent's staffing agency. Claimant was "basically a housekeeper," and her duties included sanitizing and cleaning the facility and taking out trash. On August 27, 2020, claimant was working when her shirt got caught in a machine. She stated that the machine "yanked" her arm, so she threw herself back, resulting in her hitting her head on the concrete. The incident tore the shirt claimant was wearing. Another employee gave claimant his shirt. She noted that the shirt she was wearing when she was

caught in the machinery was stained with her blood near the shoulder and armpit region. Claimant reported that immediately after the injury she was "in shock," but finished her work for the day at the direction of respondent. When the shock and adrenaline wore off, "about an hour and a half" after the incident, claimant felt "a lot of burning." She noted that the pain felt about an "8" on a 10-point scale.

¶ 11    The day after the incident, claimant received medical treatment at New Baden Urgent Care. There, claimant underwent an X ray. She was then given a sling and instructed to see her primary care physician, Dr. David Neighbors. Dr. Neighbors checked claimant's range of motion, noted that her arm was still swollen, and told claimant that she needed physical therapy. Claimant was unable to proceed with physical therapy, however, as "Workmen's comp kept denying it." She continued to follow up with Dr. Neighbors until he retired (the retirement date of which is unclear). After Dr. Neighbors's retirement, claimant was unable to see another doctor. Claimant explained that no other doctors would take her case "because they weren't getting paid." During this time, claimant described her symptoms as a burning pain in the neck area upon moving her shoulder and headaches. When she was receiving care from Dr. Neighbors, claimant had a burning sensation and limited range of motion in her right shoulder. Claimant's last appointment with Dr. Neighbors was in September 2020.

¶ 12    In the period between seeing Dr. Neighbors and another physician, claimant's symptoms worsened. She stated that she did not get care for her worsening symptoms because workers' compensation denied her request to see a doctor and she did not have other insurance. Claimant stopped working with respondent and obtained new employment with Arrow in December of 2020. At Arrow, she made and packed boxes. Her duties required her to lift approximately five pounds as she packed a box and put it on the conveyor belt. She suffered no additional injuries at Arrow

but ultimately left her employment there as she was coming home in extreme pain. Claimant then began to work at Jim's Formal Wear (Jim's). At Jim's, claimant would inspect shirts, replace any missing buttons, and pack the shirts into bags. Claimant suffered no workplace injuries while working at Jim's.

¶ 13    Claimant testified that she feels pain in her neck every day. When she lays in bed, her neck "shoots pain down into [her] shoulders," and when she is driving, if the truck hits a bump, "it shoots pain." She also feels pain occasionally when she turns her head without rotating her body. Daily activities, including brushing her hair and getting dressed, also cause pain.

¶ 14    On May 20, 2021, claimant saw Dr. Thomas Lee. Dr. Lee prescribed an anti-inflammatory for claimant's shoulder and took MRIs. Dr. Lee also prescribed injections and had claimant complete 12 weeks of physical therapy. Claimant reported that the injections made her symptoms worse and physical therapy did not help to alleviate the pain. When claimant's symptoms did not improve, Dr. Lee referred claimant to Dr. Matthew Gornet, who recommended that she have surgery to replace three discs in her neck and remove a bone spur. Claimant was denied surgery by respondent's workers' compensation insurance carrier. Claimant also saw Dr. Michael Chabot at respondent's request. Claimant testified that Dr. Chabot examined her for about 15 to 20 minutes. Prior to the August 27, 2020, injury, claimant had neither received medical treatment for her right shoulder or neck nor suffered an injury to either area.

¶ 15    On cross-examination, claimant testified that she experienced a lapse in medical treatment because workers' compensation denied her care for a period. She had no other communication issues. Claimant explained that her employment with respondent ended in October 2020 because she was escorted out of the building one day. Claimant had gone to the PlaceSmart building seeking her case number because her telephone calls had gone unanswered. Claimant further

testified that prior to August of 2020, she had experienced migraines. She had informed her doctor of her history of migraines.

¶ 16    On re-direct examination, claimant explained that the headaches she has experienced since the injury are different from the migraines she has had in the past. She feels her migraines "up in the front right by the eyes," whereas she feels the headaches from her shoulder "in the back at the base of the skull." The headaches from her shoulder cause stabbing pain.

¶ 17                              B. Testimony of Mark Veriga

¶ 18    Claimant also called Mark Veriga as a witness. Veriga is married to claimant. At the time of the arbitration hearing, Veriga and claimant had been in a relationship for almost four years. The two have lived together almost the entire time. Veriga testified that prior to claimant's workplace injury, she had never needed medical treatment for her neck or right shoulder. In the four years Veriga has known claimant, he has never known her to have a neck or right shoulder injury. She has not injured herself since the accident on August 27, 2020. Veriga testified that, following the work injury, claimant has struggled with basic tasks, such as reaching into the washing machine and dryer, yardwork, and taking dishes out of the oven. Claimant additionally wakes up in the middle of the night with pain and struggles to sit in a chair and watch a movie.

¶ 19                              C. Testimony of Joyce Tanner

¶ 20    Respondent called Joyce Tanner as a witness. Tanner testified that she is employed by PlaceSmart as an executive administrative director. Her job duties include handling benefits, workers' compensation, payroll, and oversight of staff. She handles about one or two workers' compensation cases a month. Tanner was the executive administrative director when claimant was injured. She became aware of claimant's injury when a plant manager emailed her. Upon learning of claimant's injury, Tanner filed a report and scheduled claimant a doctor's appointment at an

urgent care facility for the next day. Tanner was contacted by a medical professional and thereafter authorized physical therapy for claimant. She did not remember where she authorized physical therapy but recalled that the "authorization was done sometime [in] early September." She authorized the physical therapy over the phone on a call to a doctor's office. Tanner attempted to contact claimant by phone regarding the physical therapy authorizations but was unsuccessful in doing so. She was unaware of any attempts by claimant to contact PlaceSmart about returning to work after September 2020. Tanner did not recall that claimant was escorted from the premises of the PlaceSmart building in October 2020.

¶ 21 On cross-examination, Tanner clarified that she did not work for the workers' compensation insurance company. However, she did not agree with the assertion that she personally had no authority to approve or deny treatment. She asserted that she "treat[s] people" as soon as possible. Tanner testified that she only attempted to contact claimant about physical therapy by telephone. She did not send any letters, text messages, or emails. She elaborated that she would have known if claimant was escorted out of the office, as she sits "right by the door." Regarding physical therapy, Tanner testified that she authorized physical therapy through Clinton County Rural Health. When asked if she was aware that Clinton County Rural Health does not do physical therapy, she stated that they were going to schedule an appointment.

¶ 22 D. Claimant's Medical Records

¶ 23 On August 28, 2020, claimant visited St. Joseph's Convenient Care and was evaluated by Nurse Practitioner Alison Miller. Miller noted that claimant had been complaining of right shoulder pain beginning after her work injury. It was noted that claimant deferred movement due to pain. Miller documented that claimant was exhibiting decreased range of motion, tenderness, swelling, and pain to her right shoulder. Miller stated claimant's right shoulder exhibited severe

ecchymosis and tenderness to palpation. There was an open skin tear over the acromioclavicular joint and scattered abrasions. Claimant was placed in a sling and told to follow up with her primary care physician.

¶ 24    On August 31, 2020, claimant saw Dr. Neighbors. Claimant told him that she had experienced "immediate pain in her right shoulder region and noticed that the skin had been torn in multiple places." Claimant did not have any distal symptoms of numbness or tingling. She told Dr. Neighbors that since her visit to urgent care, she only felt pain in the anterior and lateral shoulder and upper arm. Dr. Neighbors reported that claimant had normal distal neurovascular function in the right upper extremity, but there was a moderate hematoma and ecchymosis over the deltoid region of the upper arm as well as the anterior upper arm. Claimant experienced pain at the extremes of the shoulder's range of motion. She had normal range of motion of the neck and back. Dr. Neighbors authorized claimant to remain off work.

¶ 25    Claimant saw Dr. Neighbors again on September 4, 2020. She reported that her pain had decreased but that it was still significant enough that she needed ice and Aleve after movement. She was unable to lie on her right side at night and experienced some "lightning like pain" over the inner aspect of the right arm. Dr. Neighbors reported that claimant still had significant ecchymosis over the deltoid and decreased strength in that region. He further reported that claimant was to start physical therapy that day. Claimant was not yet cleared to return to work.

¶ 26    Claimant had another follow-up session with Dr. Neighbors on September 22, 2020. Dr. Neighbors noted that claimant had "not been able to get into physical therapy yet because of Workmen's Compensation delays." Claimant had been feeling better but did report intermittent pain in her right arm extending into her hand. She had no further symptoms at the time of the appointment and no new or residual complaints. Dr. Neighbors reported that there was no

ecchymosis and claimant had normal range of motion with some residual pain at the extremes. Claimant reported that she wanted to return to work. Dr. Neighbors informed her that return to work would be left to the discretion of respondent. He further stated that he wished to see her for another appointment after she had completed two weeks of physical therapy.

¶ 27    On May 20, 2021, claimant saw Dr. Lee. She reported to him that she had been experiencing "ongoing symptoms of right shoulder pain, trapezial pain that goes toward the base of the neck." He reported that there was right shoulder pain that goes "into the dorsal forearm into the C7, possibly C6 distribution, numbness and tingling." Dr. Lee ordered an MRI and physical therapy. Claimant's MRI revealed "a small amount of fluid within the subacromial subdeltoid bursa," which could represent bursitis.

¶ 28    Claimant followed up with Dr. Lee on July 6, 2021. At this visit, claimant reported to Dr. Lee that when she wrenched herself from the machinery during the August 27, 2020, accident, she also fell backwards. After reviewing the MRI, Dr. Lee reported that claimant had a "[l]eft [*sic*] shoulder strain with residual subacromial bursids [*sic*] and effusion," as well as C3-4, C4-5, and C5-6 disc protrusions. Dr. Lee ordered claimant to continue with physical therapy and scheduled an epidural injection into the C5-6 midline.

¶ 29    On September 2, 2021, claimant returned to Dr. Lee. She reported that she had not gotten relief from the epidural injections. An examination revealed that she had "restricted motion patterns of her neck." Dr. Lee referred claimant to Dr. Gornet for a surgical evaluation.

¶ 30    Claimant saw Dr. Gornet on November 8, 2021. In her consultation with Dr. Gornet, claimant described her incident and elaborated that when she wrenched herself out of the machine, she fell backwards, landing on her back and striking her head. Claimant's main complaint was neck pain from the base of her neck to her right trapezius muscle. Dr. Gornet noted that claimant

had decreased range of motion rotating to the right and when extending. He further noted that her cervical spine revealed well-preserved disc height at all levels. Upon a review of her MRI, he saw structural disk pathology to the right side at C3-4, C4-5, and C5-6. Dr. Gornet opined that claimant sustained a disc injury at C3-4, C4-5, and C5-6 with aggravation of preexisting foraminal narrowing on her right side. He believed that this injury was sustained during and causally connected to her workplace injury of August 27, 2020.

¶ 31                              E. Dr. Lee's Evidence Deposition

¶ 32     Dr. Lee testified by evidence deposition on February 8, 2022. Dr. Lee is a board-certified orthopedic surgeon, practicing orthopedics for 32 years. Dr. Lee performed spinal surgeries at one point in his career, but no longer does. Dr. Lee testified that claimant presented with a history of ongoing symptoms she had experienced following a workplace accident. Upon examination, he noted that claimant had decreased range of motion in her neck. He noted that she had tenderness in the trapezium muscle, between her neck and her shoulder. Her biceps tendon running high into her shoulder was extremely tender. Additionally, he indicated that claimant showed signs of compression against her rotator cuff when elevating her shoulder. Dr. Lee interperted claimant's X rays to show that the disc spaces in her neck/ cervical spine were well preserved. Dr. Lee ordered MRIs. He testified that the MRIs revealed fluid in the space above the rotator cuff and disc protrusions at C3-4, C4-5, and C5-6. Dr. Lee believed the conditions were caused or aggravated by claimant's workplace accident. When physical therapy and epidural injections did not alleviate claimant's pain, Dr. Lee referred her to Dr. Gornet.

¶ 33     On cross-examination, Dr. Lee testified that he has not performed a spine surgery since 2018 due to a pinched nerve in his neck. However, he still sees patients who present with spine problems. He evaluates patients, treats them conservatively, and if the patient requires surgery, he

will refer them to a colleague. Dr. Lee confirmed that he reviewed claimant's prior medical records when treating her. There were no cervical spine complaints in those records. He also acknowledged that there was an approximate eight-month gap in treatment before he met with claimant. Dr. Lee testified that he believed it "perfectly reasonable" that claimant's prior doctors would focus on her shoulder area and not the cervical spine due to the "obvious significant trauma to the area around her shoulder." He did not believe that the two jobs claimant had following her workplace incident caused the injury to the cervical spine. Dr. Lee further clarified that he diagnosed claimant with "bursitis at the shoulder, subacromial bursitis, which is related to impingement of the rotator cuff on the acromion bone above the shoulder." When asked how soon one would start experiencing symptoms from a traumatically induced cervical herniated disc, Dr. Lee testified that he believed one would start experiencing symptoms within six weeks. He further testified that symptoms could "go under the radar for a longer period of time" when there is an area that overlaps, such as with radiating pain from the shoulder. When asked his opinion whether, in an event where a medical provider examines a patient's cervical spine six weeks after a traumatic incident and notes full range of motion, it seems indicative that the patient has a cervical herniation, Dr. Lee stated that such facts "would argue against it." When asked whether he agreed that claimant's MRI revealed more stenosis and spurring on the left side of her neck, Dr. Lee did note that there "are more references to the left side than to the right," but maintained that one could exhibit neurological deficits on the side opposite the impingement.

¶ 34                          F. Dr. Chabot's Evidence Deposition

¶ 35     Dr. Chabot testified by evidence deposition on July 15, 2022. Dr. Chabot is an osteopath and fellowship trained spine surgeon, practicing for 28 years. He testified that he sees between 80 and 85 patients per week, including clinical visits, hospital consultations, and emergency room

visits. About 40 percent of his patient visits are related to issues with the cervical spine. He performs between five and seven surgeries a week.

¶ 36    Dr. Chabot testified that he examined claimant once, on November 17, 2021. Claimant complained of a moderate sharp burning pain in the posterior neck and right shoulder. She reported that the pain was localized to the posterior neck. She sometimes experienced a popping sensation in her neck when turning her head. He reviewed the MRI report, which suggested "some small amount of fluid within a subacromial subdeltoid bursa, which may represent bursitis." The report also suggested disc degeneration and bulging at several levels in the cervical spine. Dr. Chabot also noted that claimant had a history of chronic back pain and in 2009, had a spinal cord stimulator inserted and removed.

¶ 37    Dr. Chabot recalled reviewing Dr. Gornet's treatment notes for claimant. He testified that although he read the reports, he conducted his own examination, because he does not "rely on MRI reports, especially those read by Dr. Ruyle," who wrote the report for Dr. Gornet. Dr. Chabot opined that Dr. Ruyle "tends to overembellish the reports," based on his years of experience reading Dr. Ruyle's reports. Based on his evaluation of claimant, Dr. Chabot's impression was "a history of right shoulder strain, healed right shoulder abrasion, history of chronic back pain, history of failed lumbar fusion surgery, and cervicalgia," or neck pain. His examination of her neck revealed mild tension and about a 20 percent loss in her range of motion in all directions. Dr. Chabot believed that the issues with claimant's cervical spine were not acute but chronic. He opined that claimant sustained a right shoulder strain. He did not believe that she sustained a cervical injury at work on August 27, 2020. Dr. Chabot noted that there was no mention of neck pain until claimant saw Dr. Lee on May 20, 2021. He further indicated that he believed claimant had reached maximum medical improvement (MMI) regarding the shoulder injury.

¶ 38    Additionally, Dr. Chabot noted that the MRI revealed claimant's pathology is primarily on the left side of her cervical spine, which he did not believe correlated to the right shoulder injury. He disagreed with Dr. Lee's view that right-side complaints could arise from left-side pathology. Dr. Chabot additionally asserted that he would not recommend surgery for claimant's cervical spine, as she had no specific or radicular complaints. Rather, it seemed to him that they were "just guessing as to which levels may be involved, if they are involved, in the complaints." He did not believe "just because a person has some degeneration involved disc at multiple levels," that the person would be a candidate for surgery.

¶ 39    On cross-examination, Dr. Chabot confirmed that most of the legal medical work he performed was on behalf of employers or insurance companies. He disagreed with the idea that individuals sometimes refer to "their neck pain as shoulder pain and vice versa," as he thinks "people refer to their shoulder pain as shoulder pain and neck pain as neck pain." He further clarified that he believed claimant's MRI revealed some changes on the left side, with a shallow disc protrusion of the left C4-5, as well as some disc spur complexes on the left. He saw no evidence of neural compression or disc pathology on the right side. He disagreed with an article from the Journal of Spine Surgery that supported the argument that "sometimes contralateral symptoms do occur" with pathology like claimant's. In opposing the report, Dr. Chabot stated that in 28 years of practice and over 10,000 cases, he had never seen that occur.

¶ 40    Dr. Chabot further testified that claimant did not complain of headaches to him. In addition, he did not find her headaches to be indicative of radiculopathy, as claimant had a history of migraines and did not have symptoms in the distribution along the nerve. He noted that on the intake sheet, claimant diagrammed pain isolated to the posterior neck with no indication of headaches. He could not remember claimant discussing pain in her right shoulder during his

examination; she only described neck pain at the appointment. Dr. Chabot agreed that an individual could have asymptomatic pathology in their cervical spine. He also agreed that one could sustain an injury to the cervical spine which would cause an asymptomatic injury to become symptomatic.

¶ 41    Additionally, Dr. Chabot testified that he did not believe claimant was a proper candidate for surgery. He testified that surgery would be appropriate if she had complaints of radiculopathy and he could find a source for her symptoms. He did not believe claimant's pain was indicative of radiculopathy. He elaborated that surgery would be appropriate specifically if there were "neck and arm complaints with radiation to the dermatome of the nerve, and physical findings that support the level of involvement," which he did not find present in claimant. Based on claimant's complaints of posterior neck pain, he would not recommend surgery.

¶ 42    On re-direct examination, Dr. Chabot testified that while complaints of pain are subjective, he found no objective evidence in claimant's case to confirm or corroborate her complaints of neck pain. Additionally, he opined that the images of claimant's cervical spine revealed chronic issues typical for someone claimant's age.

¶ 43                           G. Arbitrator's Decision

¶ 44    Based on the foregoing record, the arbitrator concluded that the current condition of ill-being of claimant's right shoulder is causally related to the accident of August 27, 2020, but that claimant failed to prove that her cervical spine condition was causally related to her August 27, 2020, workplace injury. Specifically, the arbitrator noted that "[s]hortly after the accident, [claimant] sought medical treatment for right shoulder/arm symptoms." She was subsequently diagnosed with a right shoulder strain and bursitis. When claimant was treated by nurse practitioner Miller and Dr. Neighbors, she complained of right shoulder symptoms. She did not complain of any neck or cervical spine symptoms at that time. Claimant did not seek medical care between

September 2020 and May 2021. On May 20, 2021, claimant saw Dr. Lee. This was the first time she informed a medical provider that she had neck/cervical spine symptoms which she believed were connected to the August 27, 2020, accident. Dr. Lee testified that he believed claimant's right shoulder and cervical spine condition were both related to the August 27, 2020, accident. He based this opinion on his belief that claimant's neck/cervical spine symptoms went "under the radar for a longer period of time," because the medical providers who initially provided claimant care were focused on the shoulder injury, which was in an "overlapping area" with the neck/cervical spine. Dr. Lee did testify, however, that "when one sustains an injury to the cervical spine, such an individual would typically experience cervical spine symptoms within the first six weeks following the injury." Respondent's medical examiner, Dr. Chabot, noted that claimant did not inform the medical professionals who originally treated her of any cervical spine complaints. Additionally, Dr. Chabot disagreed with Dr. Lee's opinion that the cervical spine condition could go undetected. The arbitrator found the opinion of Dr. Chabot to be more persuasive than that of Dr. Lee regarding claimant's cervical spine condition.

¶ 45                                 H. Commission's Decision

¶ 46     A majority of the Commission modified the decision of the arbitrator in part, but otherwise affirmed and adopted the arbitrator's decision and remanded the matter for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327. In support of this finding, the Commission noted that when claimant last saw Dr. Neighbors on September 22, 2020, the doctor's physical examination revealed that claimant's right shoulder condition had significantly improved. Claimant still had some intermittent pain in the right arm radiating to her hand but had no symptoms during the appointment. Dr. Neighbors told claimant to return for an appointment after completing two weeks of physical therapy, but in contrast to the notes from claimant's prior visits, he did not include a

work status note and "did not outright restrict [claimant] from returning to work."

¶ 47    The Commission noted that claimant stated that she was not examined again by Dr. Neighbors because he retired. Claimant did not present any evidence regarding when he retired. The Commission stated it was "unpersuaded by [claimant's] testimony that she was unable to obtain any medical treatment during the prolonged gap in treatment as no doctor would agree to treat her through workers' compensation insurance." It reasoned that claimant provided no evidence corroborating this testimony. Rather, it found that, based on testimony and emails in the record, "the credible evidence reveals that [claimant] did not pursue any additional treatment before she started her new job on or around December 15, 2020." There was no evidence that claimant's counsel raised any issues with respondent's counsel regarding the outstanding physical therapy prescription or her inability to obtain additional treatment prior to December 14, 2020.

¶ 48    Commissioner Amylee Simonovich dissented. She found claimant's testimony regarding a lack of authorization for physical therapy persuasive, citing Dr. Neighbors's note on September 22, 2020, that claimant had not been authorized for physical therapy, as well as a series of emails between claimant's counsel and respondent's counsel wherein claimant's counsel sought authorization for physical therapy in February and March of 2021. Commissioner Simonovich found credible Dr. Lee's testimony that the pain in claimant's neck could have gone undetected because of significant trauma to her shoulder, an overlapping area. She was unpersuaded by Dr. Chabot's testimony where Dr. Lee and Dr. Gornet testified that the cervical spine injury was causally related to claimants August 27, 2020, work injury. Additionally, Commissioner Simonovich placed no weight on the gap in treatment between claimant's last appointment with Dr. Neighbors and the appointment with Dr. Lee, when she first mentioned her neck pain. Rather, Commissioner Simonovich posited, if physical therapy would have been authorized for claimant

sooner, "the full extent of [her] injuries would have been revealed much earlier."

¶ 49                                    I. Circuit Court Decision

¶ 50     On judicial review, the circuit court of St. Clair County confirmed that portion of the Commission's decision with respect to claimant's shoulder injury. However, the court set aside the Commission's finding that the injury to claimant's cervical spine is not causally connected to her workplace accident. With respect to the latter finding, the circuit court noted that the Commission "disregarded the fact that [claimant's] cervical issues arose only after her work injury and focused instead on alleged omissions of cervical pain complaints without considering documented shoulder trauma." It thus disregarded Dr. Lee's testimony that there is "a lot" of overlap between the neck and shoulder. The circuit court explained that while claimant did not complain of cervical pain in her first few visits with Dr. Neighbors, "circumstantial evidence, especially when entirely in favor of the [claimant], is sufficient to prove a causal nexus between an accident and the resulting injury." See *Gano Electric Contracting v. Industrial Comm'n*, 260 Ill. App. 3d 92, 96 (1994); *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59 (1982). Additionally, it noted that "[m]edical evidence is not an essential ingredient to support the conclusion that a workplace accident caused the injury." See *International Harvester*, 93 Ill. 2d at 63. Further, the court elaborated that "a claimant's testimony, standing alone, may support an award where all of the facts and circumstances do not preponderate in favor of the opposite conclusion." See *Seiber v. Industrial Comm'n*, 82 Ill. 2d 87, 97 (1980).

¶ 51     The circuit court found that the Commission's causation finding with respect to the neck/cervical spine condition was against the manifest weight of the evidence based on the testimony of claimant and Dr. Lee. Dr. Lee testified that there was a lot of overlap between the neck and the shoulder, and it was his opinion that the injuries to her cervical spine were caused by

the August 27, 2020, accident. He testified that there was no evidence of claimant sustaining a new injury to the right shoulder or cervical spine since August 27, 2020. The trial court also found credible claimant's testimony that she was delayed in receiving physical therapy. The court found that "[c]ontrary to Respondent's assertions, [claimant] did not voluntarily discontinue treatment, but rather her efforts to secure essential medical care were impeded by Respondent's prolonged inaction and refusal to authorize prescribed therapy."

¶ 52    Accordingly, the circuit court reversed the decision of Commission. This appeal followed.

¶ 53                                    IV. ANALYSIS

¶ 54    On appeal, respondent challenges the circuit court's decision setting aside the finding of the Commission. Specifically, respondent argues that the Commission's finding with respect to causation of claimant's cervical spine injury was not against the manifest weight of the evidence. In addressing respondent's argument, we review the decision of the Commission, not the circuit court. *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 543 (2010); *Travelers Insurance v. Precision Cabinets, Inc.*, 2012 IL App (2d) 110258WC, ¶ 33.

¶ 55    An employee's injury is compensable under the Act only if it arises out of and occurs in the course of the claimant's employment. 820 ILCS 305/2 (West 2020). Both elements must be present at the time of the claimant's injury in order to justify compensation. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 483 (1989). The phrase "in the course of" refers to the time, place, and circumstances of the injury. *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 162 (2000). For an injury to "arise out of" one's employment, it must have an origin in some risk connected with or incidental to the employment. *Navistar International Transportation Corp. v. Industrial Comm'n*, 315 Ill. App. 3d 1197, 1203 (2000).

¶ 56    Similarly, the employee must establish the existence of a causal relationship between his or her current condition of ill-being and employment. *Navistar International Transportation Corp.*, 315 Ill. App. 3d at 1202. An occupational accident need not be the sole or principal causative factor in the resulting condition of ill-being, as long as it was *a* causative factor. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). Hence, a claimant need prove only that some act or phase of his employment was a causative factor in the resulting injury. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592 (2005).

¶ 57    Both the occurrence of a work-related accident and the existence of a causal relationship are questions of fact for the Commission. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005) (causation); *Pryor v. Industrial Comm'n*, 201 Ill. App. 3d 1, 5 (1990) (accident). In resolving factual matters, it is within the province of the Commission to assess the credibility of the witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). This is especially true with respect to medical issues, to which we owe the Commission heightened deference because of the expertise it possesses in the medical arena. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979); *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 386 Ill. App. 3d 779, 782-83 (2008). We review the Commission's factual determinations under the manifest-weight-of-the-evidence standard. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Bassgar, Inc. v. Illinois Workers' Compensation Comm'n*, 394 Ill. App. 3d 1079, 1085 (2009). The test is whether the evidence is sufficient to support the Commission's findings, not whether this court, or any other tribunal, might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828,

833 (2002). Moreover, we may affirm the Commission's decision on any basis supported by the record regardless of the Commission's findings or its reasoning. *Dukich v. Illinois Workers' Compensation Comm'n*, 2017 IL App (2d) 160351WC, ¶ 43 n.6.

¶ 58    Respondent asserts that the Commission properly weighed the evidence and that respondent's medical expert was more credible than claimant's experts and testimony. Specifically, respondent argues that claimant's first report of cervical spine symptoms months after she was injured could not be traced back to the August 27, 2020, workplace accident. Respondent notes that prior to her May 20, 2021, appointment with Dr. Lee, claimant never mentioned pain in her neck, did not seek treatment for her neck, and did not seek additional treatment for her right shoulder. She also worked for multiple subsequent employers in that time. Respondent contends that in forming his opinion regarding causation of the cervical spine condition, Dr. Lee disregarded the fact that claimant's medical records made no mention of neck pain or falling and hitting her head during the workplace accident. He instead based his opinion on "his belief that the medical providers who initially treated [claimant] focused on the right shoulder injury and, because the right shoulder was in 'an overlapping area,' the neck and cervical spine condition went 'under the radar for a longer period of time.' " Dr. Lee agreed on cross-examination that "when one sustains an injury to the cervical spine, such an individual would typically experience cervical spine symptoms within the first 6 weeks following the injury," which claimant did not. Respondent further argues that Dr. Chabot was more credible than Dr. Gornet, as Dr. Chabot reviewed claimant's treatment records, diagnostic reports, and images, whereas Dr. Gornet "merely took a history from [claimant], reviewed the diagnostic test results and concluded that [claimant] needs cervical disc replacement." Finally, respondent asserts that claimant provided little evidence that she was unable to receive physical therapy, while respondent provided evidence that she was

approved for physical therapy but could not be reached by telephone to schedule appointments.

¶ 59    Claimant counters that the record "does not support the Commission's findings, especially when it comes to the complaints about the cervical spine," based on the testimony of Dr. Lee. Claimant argues that the Commission disregarded the fact that her cervical spine issues arose only after she was injured at work.

¶ 60    Claimant contends that medical evidence is not an essential ingredient to support the conclusion that a workplace accident caused an employee's injury. *International Harvester*, 93 Ill. 2d at 63. Rather, circumstantial evidence is sufficient to prove a causal nexus between an accident and the resulting injury. *Gano Electrical Contracting*, 260 Ill. App. 3d at 96. Claimant urges us to apply the principle that a "work-related incident need only be a causative factor in the condition of ill-being, not the most obvious, most immediate, or most symptomatic one." *Vogel*, 354 Ill. App. 3d at 786. Accordingly, she argues that her cervical spine injury is compensable, as "[e]very natural consequence that flows from the injury is compensable unless caused by an independent intervening accident." *Id*. She further cites *Kawa v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 120469WC, for the proposition that "a lack of immediate, explicit complaints of every symptom at the first medical visit cannot defeat causation, especially where the record clearly traces a petitioner's declining condition back to the workplace accident."

¶ 61    Applying the deferential standard applicable to the issues raised on appeal, we cannot conclude that the Commission's findings related to the causation of claimant's cervical spine injury were against the manifest weight of the evidence.

¶ 62    The Commission was presented with conflicting medical opinions as to whether claimant's condition of ill-being in her cervical spine is causally related to the August 27, 2020, accident. In this regard, Dr. Lee testified that although claimant did not previously complain of injury to her

neck or cervical spine, he believed that claimant's condition was causally related to her workplace accident. He found it apropos that Dr. Neighbors would have only treated claimant's shoulder as there were abrasions and Dr. Neighbors was claimant's primary care physician. Further, he placed no weight on the fact that claimant had not previously complained of neck pain, as the neck and shoulder were overlapping areas. He opined the neck pain could have gone under the radar, despite agreeing that it is likely that claimant would have experienced some cervical spine symptoms within the first six weeks following her injury. Conversely, Dr. Chabot testified for respondent, and he opined that claimant's cervical spine injury was not causally related to the August 27, 2020, accident. Dr. Chabot noted that claimant did not complain of cervical spine pain until nearly nine months after the accident. Before then, the treatment notes from Dr. Neighbors indicated that claimant's condition was improving and she was not experiencing symptoms at the time of her September 22, 2020, appointment. Additionally, Dr. Chabot reviewed claimant's MRIs and concluded that her cervical spine injury appeared to be chronic, not acute. He could not rule out that her injury was not exacerbated by her work activities at her two jobs after the August 27, 2020, accident.

¶ 63    Based upon the foregoing, we hold that the Commission's decision was not against the manifest weight of the evidence. Further, we are not swayed by the cases upon which claimant relies. In *Kawa*, 2013 IL App (1st) 120469WC, ¶ 94, the onset of the claimant's pain symptoms began when he was in a work-related vehicle accident, and he experienced uninterrupted pain since the time of that accident. Here, claimant's symptoms had improved, and she did not provide evidence of ongoing pain during the period she was not receiving treatment. There was no indication that she suffered symptoms in the cervical spine prior to May 20, 2021. Likewise, in *Vogel*, 354 Ill. App. 3d at 788, the claimant suffered an injury, which was later aggravated by

superseding events. However, the claimant did not begin suffering a new series of symptoms which had not been previously complained of as with claimant here.

¶ 64    In sum, the Commission's findings that claimant failed to prove a causal connection that the August 27, 2020, accident and the condition of ill-being in her cervical spine are not against the manifest weight of the evidence in light of the testimony presented at the arbitration hearing, the conflicting medical opinions presented by the parties, and the Commission's role as fact finder.

¶ 65                              V. CONCLUSION

¶ 66    For the reasons set forth above, we reverse that portion of the circuit court's order setting aside the Commission's finding that claimant's cervical spine injury was not causally related to her workplace accident, reverse any benefits awarded by the trial court with respect to the injury to the cervical spine, and affirm the circuit court's order in all other respects. Further, this cause is remanded for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327.